No. 93-369

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

STATE OF MONTANA,

     Plaintiff and Respondent,

-v-

LARRY T. MOORE,

     Defendant/Appellant.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Larry W. Moran, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Larry Jent, Williams, Jent & Dockins, Bozeman,
Montana; Herman A. Watson, III, Bozeman, Montana

     For Respondent:

          Hon. Joseph P. Mazurek, Attorney General, Mark
Murphy and Cregg W. Coughlin, Assistants Attorney
General, Helena, Montana; Mike Salvagni, Gallatin
County Attorney, Robert W. Brown, Special Deputy
County Attorney, Bozeman, Montana

FILED

NOV 22 1994

Filed:

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Heard: September 1, 1994
Submitted: September 13, 1994
Decided: November 22, 1994

Justice James C. Nelson delivered the Opinion of the Court.

Defendant Larry Moore was charged with deliberate homicide in violation of § 45-5-102(1)(a), MCA, and two counts of tampering with or fabricating physical evidence, in violation of § 45-7-207(1)(a) and (b), MCA. The District Court severed the tampering charges, and Moore was tried before a jury on the deliberate homicide charge in the Eighteenth Judicial District Court, Gallatin County, on October 22, 1992 through November 17, 1992. The jury returned a guilty verdict on November 19, 1992. At sentencing, the District Court dismissed sua sponte the two counts of tampering with or fabricating evidence. Moore appeals his conviction of deliberate homicide. We affirm.

## ISSUES

We state the issues on appeal as follows:

1. Whether the District Court erred in allowing the introduction of the DNA analysis evidence after it had excluded the statistical evidence relating to the DNA testing?

2. Whether the District Court erred in admitting the results of DNA tests performed on the muscle tissue found in Moore's camper?

3. Whether the District Court erred in admitting the PCR results performed on brain tissue discovered inside Moore's camper?

4. Whether the District Court erred in denying Moore's motion to suppress a statement he made to Sgt. Burns while being transported in a patrol car?

5. Whether the District Court erred in denying Moore's motions for a change of venue and motion for individual voir dire on the issue of pretrial publicity?

6. Whether the District Court erred when it denied

2

Moore's motion for a new trial on claims of juror misconduct?

7. Whether the District Court erred when it prohibited Moore from impeaching the verdict with juror testimony?

8. Whether the District Court erred when it denied Moore's motion for a judgment of acquittal alleging there was insufficient evidence to convict him of deliberate homicide?

9. Whether Moore was denied his right to a speedy trial?

FACTUAL BACKGROUND

Larry Moore was charged with deliberate homicide, following the disappearance of Brad Brisbin. Brisbin, a West Yellowstone restaurant owner, was last seen November 9, 1990. Rene Brisbin, Brisbin's wife, testified that her husband told her that Moore had called him on the morning of November 9th, and asked Brisbin to meet him at Bair's truckstop because he had sold his pickup and camper and needed a ride back to West Yellowstone.

Brisbin went to the high school where he was employed as a part-time teacher. He told the principal that he needed the day off to deal with a screwed up friend. Two people testified that they saw Brisbin driving up Gallatin Canyon the morning of November 9th. Both testified they saw nothing unusual with Brisbin's driving. Brisbin has not been seen since the morning of November 9, 1990.

That afternoon, Moore drove his pickup with his camper back to West Yellowstone. Shortly before 1:00 p.m. on November 9, 1990, Moore called his construction shop and asked Jerry Hillier, one of Moore's employees, to warm up the backhoe. Moore arrived at the

3

shop at approximately 1:00 p.m., and left the shop with the backhoe at approximately 1:30 p.m. Mr. Hillier testified that he saw the backhoe parked in the construction yard at 3:00 p.m. Mr. Moore, however, did not return to the shop until 5:00 pm.

That evening Moore began to tell people that Brisbin had climbed into a car on Interstate 90, with a woman driver. Moore's story concerning that morning's events changed considerably over the course of time.

Moore became a suspect in the case, and police obtained a search warrant for his pickup and camper. Investigators found three bullet holes under the interior step. They also found a piece of tissue on a curtain in the camper, a bullet with blood on it, and blood stains, which Moore had attempted to obliterate, throughout the camper.

The police confronted Moore with this evidence, and he began to change his story. Moore eventually told the police that Brisbin had been drinking the morning of November 9th, and was waiving a gun around in the back of Moore's camper. Moore struggled to get the gun away from Brisbin and when the gun accidentally discharged, the shot grazed Brisbin's head. Brisbin was bleeding, and Moore went into the truckstop to get some water to clean up the blood. When he returned, Brisbin was not in the camper, but Moore believed he saw Brisbin on the on-ramp of the interstate getting into a red car.

Law enforcement sent the tissue found on the curtain in the camper to the Montana State Crime Lab, which determined that the

4

tissue was of human origin. The State Crime Lab divided the tissue into three pieces: one portion was sent to Cellmark Diagnostics (Cellmark), one to Analytic Genetic Testing Center (AGTC), and the State Crime Lab retained one portion. Cellmark, a laboratory which performs deoxyribonucleic acid (DNA) analysis, conducted restriction fragment length polymorphism analysis (RFLP) typing on DNA extracted from the muscle tissue.

AGTC tested the muscle tissue using GM/KM analysis. GM/KM markers are an inherited variation of antibody molecules found in blood serum, human tissue and body fluids, which have a significant variation between populations so that, for instance, some combinations of markers are only found in the Caucasian population, and some in the Afro-American population. GM and KM markers have been used since the 1960's to identify and individualize human blood for forensic applications. The results of the GM/KM analysis confirmed that the muscle tissue was human and the tissue was consistent with having come from the biological father of Brisbin's children.

While examining blood stains located on the underside of the interior step board, which had been removed from Moore's camper, a forensic scientist at the Montana State Crime Lab found a small piece of tissue. The tissue was determined to be cerebellum tissue, which is located at the base of the brain, under the skull bone. The State Crime Lab embedded the brain tissue in a paraffin block and sent it to Dr. Cosette Wheeler, at the University of New Mexico Cancer Center, who extracted DNA from the tissue. Dr.

5

Wheeler then sent the processed tissue to AGTC which conducted polymerase chain reaction (PCR) analysis on the sample tissue. AGTC also conducted PCR analysis on members of the Brisbin family and concluded that the tissue could not be excluded as having come from the biological father of the Brisbin children.

Moore was charged by information on December 17, 1990 with two counts of tampering with or fabricating physical evidence and one count of deliberate homicide. Upon Moore's motion, the District Court severed the tampering with or fabricating physical evidence charges. A jury trial was held October 22 through November 17, 1992, and Moore was found guilty of deliberate homicide. Moore appeals this conviction. Additional facts will be presented as is necessary for the discussion of the issues.

## DNA PROFILING ISSUES

The first three issues we consider on appeal raise questions concerning DNA profiling. This case presents the first instance in Montana that forensic DNA analysis evidence has been introduced in a criminal trial which has reached this Court on appeal. Therefore, before we begin analysis of the legal principles involved in those issues, it is necessary to set out a brief introduction to the basic theory of DNA analysis. The discussion of DNA and RFLP analysis is derived from the following sources: testimony at the admissibility hearing and trial, United States v. Jakobetz (2nd Cir. 1992), 955 F.2d 786, cert. denied 113 S.Ct. 104, 121 L.Ed.2d 63; Commonwealth v. Curnin (Mass. 1991), 565 N.E.2d 440; People v. Axell (Cal.App. 2 Dist. 1993), 1 Cal.Rptr.2d 411;

6

United States v. Yee, 134 F.R.D. 161 (Ohio 1991).

## Introduction

DNA is a fundamental material which determines the genetic properties of all living things. All nucleated cells of every human being contain DNA, and every cell of a particular individual contains the same configuration of DNA. The significance of DNA for forensic purposes is that, with the exception of identical twins, no two individuals have identical DNA. Another important fundamental aspect of human genetics is that, except for unusual but recognized occurrences of mutation, offspring inherit genes from their parents, receiving one-half from the mother and one-half from the father.

The DNA molecule is composed of a long double helix, which looks like a twisted ladder. The sides of the ladder are made up of alternating units of phosphate and sugar. Attached to the sides of the ladder are the rungs, which are made up of four types of organic bases: adenine, guanine, cytosine, and thymine. Due to their chemical compositions, adenine will only bond with thymine, and cytosine will only bond with guanine. Thus, the bases on one side of the rung will determine the order on the other side. For the purpose of DNA profiling, these base pairs are the critical components of the ladder. It is the order or sequence of the base pairs (the rungs) that determines the genetic traits of an individual life form and each human being. A specific sequence of base pairs that is responsible for a particular trait is called a gene.

7

Genetically, humans are more alike than dissimilar. Approximately 99 percent of human DNA molecules, i.e., base pair sequences, are the same, creating such shared features as arms and legs. Other sections of the DNA ladder, however, vary distinctly from one person to another. It is these variable regions, called "polymorphisms," which make it possible to establish identity and differences between individuals.

The length of each polymorphism is determined by the number of repeat core sequences of base pairs. The core sequence is called a Variable Number Tandem Repeat (VNTR) while the total fragment length is called a Restriction Fragment Length Polymorphism (RFLP). Alternative forms of RFLP's are called alleles.

A particular region on the DNA molecule where a specific VNTR occurs is called a "locus." A locus is considered polymorphic when the number of VNTR's varies from one person to another. Of the approximately three billion base pairs contained in one DNA molecule, roughly three million are thought to be polymorphic. DNA profiling focuses on several highly polymorphic or hypervariable segments of the DNA. Different people will have the same VNTRs in a particular hypervariable locus, but the loci will differ in length because varying numbers of the VNTRs are linked together. Although a person may not have a unique polymorphic area at any one locus, the frequency with which two people will exhibit eight or ten of these alleles at four or five different locations is extremely low. Thus DNA analysis attempts to detect these highly variable regions and distinguish among the alleles that exist

8

there.

At the time the testing was conducted in this case, there were two technologies generally used in forensic DNA analysis to detect the polymorphic regions: restriction fragment length polymorphism (RFLP), and polymerase chain reaction (PCR). Both methods were employed in this case.

RFLP Analysis

As is explained in Commonwealth v. Curnin, 565 N.E.2d at 446-47, and U.S. v. Jakobetz, 955 F.2d at 792-93, RFLP analysis involves several steps.

1. *Extraction of DNA.* The DNA must be extracted from the evidentiary sample by using chemical enzymes. An enzyme is then added to digest cellular material that is not DNA, thereby providing a purer sample.

2. *Restriction or Digestion.* The DNA is then mixed with restriction enzymes which cut the DNA molecules into fragments at specific base sequences. The restriction enzymes recognize particular sequences of base pairs. The enzymes sever the DNA molecule at targeted locations within the sequence. The process severs the DNA molecule at all sites targeted at locations along the three billion base pair length of the molecule. Therefore, some of the resulting "restriction fragments" will contain polymorphic DNA segments, although most will not. Because the alleles differ markedly in length from one person to the next, the restriction fragments containing the alleles will also differ in length.

9

3. *Gel Electrophoresis.* This technique entails placing the DNA fragments into an agarose gel which has a negative and positive electrode at either end. An electrical current is then run through the gel. The restriction fragments, which are negatively charged in their natural state, travel toward the positive charge. The process is able to sort the restriction enzymes by length, as the shorter fragments--which are lighter and less bulky--will travel further in the gel. Several samples are run on the gel but in different tracks or lanes which run parallel to each other. In addition to the samples, fragments of known base-pair lengths are placed in separate lanes to facilitate measurement.

4. *Southern Transfer.* This procedure transfers the fragments to a more functional surface. A nylon membrane is placed over the gel and, through capillary action, the DNA fragments attach themselves to the membrane while occupying the same position relative to one another as they had on the gel. The restriction fragments are then treated with a chemical which cuts the fragments of DNA lengthwise along each base pair, by sawing through the middle of each rung. The result is a collection of single stranded restriction fragments.

5. *Hybridization.* The nylon membrane is dipped into a solution containing various "genetic probes," which are single stranded DNA fragments of known length and sequence designed to link with identified polymorphic alleles. The probes will link only to those DNA fragments which contain base pair sequences that are complementary to the base sequences of the probe. The genetic

10

probes are tagged with a radioactive marker so that after the probe links with a particular allele, its position relative to the other restriction fragments can be observed.

6. *Autoradiography*. The nylon membrane is placed on an x-ray film and exposed by the radioactively charged probes. The result is a pattern of bands called an "autoradiograph", or "autorad." Each band represents a different polymorphic allele, and its position indicates the length of the restriction fragment in which that allele occurs. Because individuals differ in length of their polymorphic alleles, the position of the bands on the DNA prints will tend to differ from person to person.

7. *Interpretation of the DNA Print*. The DNA print of the crime sample and the DNA print of the defendant are then compared both visually and with a machine to determine if both samples of DNA came from the same person. A match will be declared if the samples fall within a certain distance of one another. Cellmark Diagnostics, the laboratory conducting the RFLP analysis in this case, will declare a match if the bands from two DNA prints fall within one millimeter of each other.

8. *Statistical Analysis*. Statistical analysis is used in both RFLP and PCR analysis. If the two DNA samples match, then population geneticists determine the likelihood that the match is unique. The scientists determine the frequency with which a particular allele is found in the population, then by using a multiplication or product rule, compute an aggregate estimate of the statistical probability that the suspect's combination of

11

alleles would be found in the relevant racial population. United States v. Bond (6th Cir. 1993), 12 F.3d 540, 550, aff'g United States v. Yee, (Ohio 1991), 134 F.R.D. 161.

PCR Analysis

AGTC tested the brain tissue by conducting polymerase chain reaction testing. The following discussion of PCR testing is taken from Thomas M. Fleming, Annotation, Admissibility of DNA Identification Evidence, 84 A.L.R.4th 313 (1991), and testimony from the trial, unless otherwise noted. PCR testing is used to increase the amount of the DNA sample. This technique makes DNA testing possible on much smaller samples than RFLP analysis. However, PCR's ability to identify a particular individual to the exclusion of others is much lower.

In this procedure, DNA is extracted from a sample purified and added to a buffer solution containing chemical primers and an enzyme called "TAQ polymerase." The solution is then placed in a heating device, called a thermal cycler, which cycles it through several successive temperature plateaus. After 30 or 40 of these cycles, the DNA has become denatured. The primers have annealed to the DNA, identifying a "gene of interest," in this case the DQ-alpha gene, which will have been replicated or "amplified" by the enzyme billions of times.

Next, the amplified DNA is flooded over a nylon membrane onto which have been dotted a number of "allele-specific" probes, each designed to recognize one variant of the DQ-alpha gene. This will result in a color reaction and a visible dot on the membrane

12

wherever a probe has identified one of the alleles.

This genetic marker system has six traits which are simply numbered, 1.1, 1.2, 1.3, 2, 3, and 4. These alleles are combined in pairs in each person, because one is received from each parent. There are 21 possible pairs of these traits, and each pairing is called a "genotype." The purpose of the testing is to identify the genotype present in the amplified DNA.

After conducting PCR analysis on the piece of brain tissue, AGTC typed it as a DQ-alpha 3, 4. AGTC also conducted PCR analysis on the Brisbin family members and found that " . . . among [the] four children, there are only two alleles found, the 4 allele . . . and a 3 allele. Since any given person can only have two alleles, the biological father of these individuals has to have a 3 allele and a 4 allele. The evidentiary material, the brain tissue, typed as a 3, 4 so it cannot be excluded as having come from the biological father."

In sum, the PCR process clones the region of a DNA strand containing the DQ-alpha gene. The copies are then analyzed to determine whether certain sequences of the gene are present.

Issue 1.

Whether the District Court erred in allowing the introduction of the DNA analysis evidence after it had excluded the statistical evidence relating to the DNA testing?

Before trial, Moore moved to have all DNA evidence excluded. After an extensive pretrial hearing concerning the admissibility of the DNA analysis evidence, the District Court denied Moore's motion, and allowed the State to present evidence concerning the

13

DNA analysis conducted on both the muscle tissue and the brain tissue. Moore then moved to exclude testimony concerning the statistical calculations which would have presented a probability that any alleged match between the tissue samples and the Brisbin children is not coincidental. The District Court granted the motion and refused to allow testimony concerning the statistics, but allowed the experts to testify that the RFLP and PCR test results were "consistent" with Brisbin. Moore alleges on appeal that the District Court erred in not excluding DNA evidence in its entirety. Moore claims that because no valid statistics were presented, the DNA evidence failed to meet requirements of Rule 702, M.R.Evid., as it failed to assist the trier of fact to understand the evidence or to determine a fact in issue.

Relying on the testimony of defense expert Dr. Shapiro, Moore states that the only way the jury has to evaluate the DNA evidence is through the statistical data which supports it. Without the statistics, the evidence is meaningless and, therefore, is not helpful to the trier of fact. Moore concludes by arguing that there is no difference between saying the evidence is "consistent" with Brisbin and that there is a "match" with Brisbin.

Admissibility of evidence is left to the sound discretion of the trial judge. State v. Stewart (1992), 253 Mont. 475, 479, 833 P.2d 1085, 1087. This Court's review of a district court's evidentiary rulings is whether the district court abused its discretion. State v. Gollehon (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263.

14

We conclude that because the District Court excluded testimony concerning the statistical evidence upon Moore's own motion, he cannot now complain that the court erred in granting his motion. The District Court concluded that the statistical probabilities "invad[es] the province of the jury, . . . [because] when you get numbers high enough, in essence you're directing a verdict, and that gets way beyond reasonable doubt." Because the ruling made upon Moore's motion benefitted the defense, Moore cannot now complain.

In addressing this same issue, the Eighth Circuit Court of Appeals held that the defendant was barred from raising the issue on appeal when he had specifically requested that the district court exclude the statistical evidence. The court noted:

> After the district court decided to admit the DNA match evidence, the court invited counsel to comment on the propriety of admitting statistical evidence of the likelihood of a match. In response to this invitation, Martinez' counsel suggested that the court exclude the probability evidence . . . Having specifically requested that the district court exclude the statistical evidence, Martinez may not now complain about its exclusion.

United States v. Martinez, (8th Cir. 1993), 3 F.3d 1191, 1199, cert denied 114 S.Ct. 734, 126 L.Ed.2d. 697. We conclude that, like the defendant in Martinez, Moore is barred from complaining that the statistical evidence was excluded because he sought its exclusion.

Our determination does not address whether we will allow the admission of DNA analysis results in a future case without the accompanying statistical analysis. We recognize that there is presently a diversity of opinion among the jurisdictions that have addressed this issue. A summary of the different approaches is

15

found in People v. Adams (Mich.App. 1992), 489 N.W.2d 192, 198, where the Michigan Court of Appeals noted:

> Some courts of other jurisdictions have ruled that DNA identification evidence is admissible at trial, but have then refused to allow into evidence the statistical analysis of the testing because the databases were shown to have not been in Hardy-Weinberg equilibrium. Curnin, 409 Mass. at pp. 225-227, 565 N.E.2d 440; Caldwell, 260 Ga. at pp. 289-290, 393 S.E. 2d 436 [1991]; State v. Pennell, 584 A.2d 513, 517-520 (Del.Super. 1989). However, other courts have recognized that conservative or reduced calculations such as those used by Cellmark may correct any Hardy-Weinberg deviation problems. Axell, 235 Cal.App.3d at p. 868, 1 Cal.Rptr.2d 411 [1991]; Caldwell, 260 Ga. at p. 289, 393 S.E.2d 436; Castro, 144 Misc.2d at p. 969, 545 N.Y.S.2d 985 [1989]. The statistical analysis of DNA testing is inadmissible in some jurisdictions because of its prejudicial effect. Schwartz [447 N.W.2d 422] at pp. 428-429 [Minn. 1989]; Pennell at pp. 519-520. On the other hand, some courts have held that such evidence is a matter of weight for the jury. Axell, 235 Cal.App.3d at p. 868, 1 Cal.Rptr.2d 411; Hopkins [Ind. 1991] [579 N.E.2d 1297] at p. 1303; United States v. Yee, 134 F.R.D. 161 (N.D. Ohio 1991).

Whether, and if so, to what extent we will allow DNA evidence without the accompanying statistical evidence in other criminal trials will be decided in a future case. Our decision in this case is based solely on the fact that Moore moved to exclude the evidence, and cannot now argue that its exclusion was error. Because Moore moved to exclude the statistical analysis evidence at trial, and in light of the varied approaches among the jurisdictions which have addressed this issue, we hold that the District Court did not abuse its discretion when it admitted the DNA analysis evidence without the statistical evidence in this case.

Issue 2.

Whether the District Court erred in admitting the results of DNA tests performed on the muscle tissue found

16

in Moore's camper?

Moore presents three arguments as to why the District Court erred in admitting the RFLP analysis in this case. First, Moore alleges that Cellmark used "sloppy laboratory techniques." Moore does not argue that the theory underlying DNA and RFLP analysis is inadmissible, rather, he states that the general reason courts exclude RFLP analysis evidence is because the particular laboratory failed to adhere to generally accepted techniques for obtaining relevant, reliable results. See, State v. Vandebogart (N.H. 1992), 616 A.2d 483; United States v. Martinez (8th Cir. 1993), 3 F.3d 1191; State v. Cauthron (Wash. 1993), 846 P.2d 502.

After a thorough review of the cases and other current literature and authorities, we conclude that the theory underlying DNA and RFLP technology is generally not open to serious attack and that such evidence is widely admitted in various state and federal courts and jurisdictions. "[T]he threshold [test] for admissibility [of DNA evidence] should require only a preliminary showing of reliability of the particular data to be offered, *i.e.*, some indication of how the laboratory work was done and what analysis and assumptions underlie the probability calculations." Jakobetz, 955 F.2d at 799-800.

While Moore first argues that the State failed to demonstrate that Cellmark's testing results were reliable because Cellmark used "sloppy laboratory techniques," he fails to identify what techniques were sloppy, or objectionable. Rather, he "incorporates by reference all the evidentiary arguments made about PCR in the

17

preceding sections [of his opening brief], as well as the technical arguments made at the [admissibility] hearing."

We conclude that Moore's argument must fail. Rule 23(a)(4), M.R.App.P., provides in pertinent part:

> The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and pages of the record relied on.

Moore failed to properly raise specific points of error concerning Cellmark's laboratory techniques, and this Court will not presume which techniques he considered were "sloppy." Accordingly, we will not address this argument further. Allmaras v. Yellowstone Basin Properties (1991), 248 Mont. 477, 483, 812 P.2d 770, 773.

Second, Moore argues that the "numbers used to mathematically determine a match by Cellmark are unreliable." Moore's argument is without merit, because, as we discussed in issue one, the District Court excluded all testimony concerning statistical evidence. Martinez, 3 F.3d at 1199.

Third, Moore argues that the District Court erred in allowing testimony that the DNA profile of the muscle tissue sample was consistent with the DNA profiles of Brisbin's children and his mother, because according to Moore, Cellmark's criteria for declaring a match, or consistency are highly suspect. Moore alleges that two probes contained "anomalies" and therefore, Cellmark should have declared these probes to be exclusions. According to Moore, the fact that Cellmark declared a match even though two anomalies were present evidences that the RFLP test results did not have a reliable foundation.

18

At this juncture, it is important that we distinguish between DNA identification analysis and DNA paternity analysis. DNA typing for forensic purposes in criminal law is usually used to aid in the identification or exclusion of criminal suspects. The characteristics of a suspect's genetic structure are profiled and compared to the genetic structure found in material such as blood or semen recovered from the crime scene. The two profiles are then compared to see if they "match."

Because Brisbin's body has never been found, the laboratories conducting the tests could not obtain a comparison sample of his DNA. The scientists therefore conducted a paternity analysis on the muscle tissue found in Moore's camper to determine if the DNA extracted from the sample muscle tissue was consistent with having come from the father of the Brisbin children. Because genes are inherited, a child will have a composite profile which is consistent with his or her parents.

Cellmark received blood samples from seven people: Rosaleen Kovash, Brisbin's former wife and the mother of Jeremiah and Erin Brisbin; Maureen Brisbin, Brisbin's wife and the mother of Parker and Mariah Brisbin; and Mary Ann Brisbin, Brisbin's mother.

Cellmark used five probes to examine five different genetic locations. The result of each probe is visible on the x-ray film or autorad, and appears as dark lines called bands. A comparison was made between the bands exhibited on the autorads for each mother, her two children, and the DNA from the tissue. For each of those comparisons, Cellmark examined the DNA pattern of the two

19

children, to determine which band in the child was consistent with the mother and if the other band was consistent with the DNA coming from the tissue. Moore contends that because two of the samples failed to visually coincide, the samples could not be said to be consistent, but were exclusions and, therefore, were inadmissible.

The first alleged exclusion concerned an autorad for the probe MS1. Both Mariah Brisbin and her mother only showed one band for this probe, and Mariah's band did not coincide with the band expressed for her mother, Maureen. Moore argues that because Mariah's maternal band did not show up on the autorad, the results were inadmissible.

In interpreting why only one of Mariah's bands was visible on the autorad, the State's expert explained that Mariah's other band had probably run off the gel and, therefore, could not be seen. The expert noted that even though the band could not be seen on the gel, one could continue with the analysis using the one band which was visible. In this case, the band which was visible on the autorad was consistent with a band from the piece of muscle tissue.

Moore also claims that an inconsistency on the probe YNH24 between Brisbin's mother Mary Ann Brisbin, and the piece of muscle tissue rendered the results inadmissible. In this instance, the band from the piece of muscle tissue did not correspond to either band from Mary Ann Brisbin's autorad. Moore claims that because neither of the bands from Brisbin's mother matched the band from the piece of muscle tissue, Cellmark should have excluded Mary Ann Brisbin as the mother of the donor of the muscle tissue. Moore

claims that Cellmark should not have concluded that Mary Ann Brisbin's results were consistent with the piece of muscle tissue in light of probe YNH24, which did not match. According to Moore, Cellmark's conclusion that the two DNA profiles were consistent evidences the lack of foundation for the entire RFLP testimony.

Of the five probes used to examine Mary Ann Brisbin's DNA profile, nine bands were visible on the autorads. The muscle tissue matched four of those bands. However, as stated above, Mary Ann Brisbin's band was not consistent with the muscle tissue's band for probe YNH224. Cellmark's experts testified that one would still have to conclude that Mary Ann was somehow genetically related to the donor of the muscle tissue, because Mary Ann's bands and the muscle tissue's bands matched on the other probes. The experts testified that given the known high mutation rate at these genetic locations, a reasonable conclusion was that a mutation slightly altered the gene at this locus.

The District Court ruled that Moore's objections to Cellmark's RFLP analysis results were a matter of weight for the jury to assign to the testimony, not a question of admissibility. We agree.

In determining whether to allow expert testimony concerning novel scientific evidence, this Court has held that "it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation." Barmeyer v. Montana Power Co. (1983), 202 Mont. 185, 193-94, 657 P.2d 594, 598. (Citation omitted.) In

21

Barmeyer we rejected the "general acceptance" test set forth in Frye v. United States (D.C. Cir. 1923), 293 F. 1013, holding that "the general acceptance rule is not in conformity with the spirit of the new rules of evidence." Barmeyer, 657 P.2d at 598. (While we stated in Martel v. Montana Power Co. (1988), 231 Mont. 96, 103, 752 P.2d 140, 145, that we "overruled" Barmeyer, it is readily apparent that the only portion of our opinion that was actually overruled was that pertaining to violation of the NESC standards being negligence per se.)

More than a decade later, the United States Supreme Court also rejected Frye's "general acceptance" standard for admissibility of expert testimony in favor of the more liberal test embodied in Rule 702, F.R.Evid. This test requires the trial judge to determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993), _____ U.S. _____, 113 S. Ct. 2786, 2796. In Daubert, the Court noted that Rule 702, F.R.Evid., still requires the district court to screen such evidence to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. Daubert, 113 S.Ct. at 2795.

To guide the trial court's assessment of the reliability of the scientific evidence offered, the Court established the following non-exclusive factors to be considered: (a) whether the theory or technique can be and has been tested; (b) whether the theory or technique has been subjected to peer review and

22

publication; (c) the known or potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; and (d) whether the theory or technique has been generally accepted or rejected in the particular scientific field. Daubert, 113 S.Ct. at 2796-97.

The Court emphasized that the inquiry under Rule 702, F.R.Evid., is "a flexible one," and that the focus is on the principles and methodology underlying the proffered evidence rather than the conclusions they generate. Daubert, 113 S.Ct. at 2797. We conclude that the guidelines set forth in Daubert are consistent with our previous holding in Barmeyer concerning the admission of expert testimony of novel scientific evidence, and we, therefore, adopt the Daubert standard for the admission of scientific expert testimony. Accordingly, we conclude that before a trial court admits scientific expert testimony, there must be a preliminary showing that the expert's opinion is premised on a reliable methodology. We note, however, that the court must be flexible in its inquiry. "Not every error in the application of a particular methodology should warrant exclusion. An alleged error in the application of a reliable methodology should provide the basis for exclusion of the opinion only if that error negates the basis for the reliability of the principle itself." Martinez, 3 F.3d at 1198.

In the instant case, although the District Court did not apply the Daubert standard, it did hold an admissibility hearing which involved seven days of testimony from scientists in the fields of

23

genetics, molecular biology, and statistics. After considering the testimony, the court concluded:

> [B]ased upon a thorough and conscientious review of all the DNA evidence, the Court's conclusion is that while there are cracks in the foundation of the testimony of some of the State's expert witnesses, such is sufficiently mitigated by the overall testimony of witnesses, Dr. Schanfield, Dr. Cotton, and Dr. Goldman, to create an issue of fact.
> In considering admissibility of evidence, the Court must walk a fine line, avoiding considerations of weight to be given the proffered evidence, and, generally, the credibility of the witnesses offering testimony. Under the circumstances presented, it is the opinion of this Court that the DNA evidence proffered by the State meets the threshold test for admissibility.
> The credibility of witnesses, issues of fact, and the weight to be accorded the testimony of witnesses are issues for a jury to resolve, not the Court. (Emphasis in original.)

Rulings on the admissibility of evidence are left to the sound discretion of the trial court. State v. Stewart (1992), 253 Mont. 475, 479, 833 P.2d 1085, 1087. In light of the District Court's extensive and thoughtful consideration of the DNA analysis evidence, we hold that it did not err in determining that Moore's objections to Cellmark's RFLP analysis were a matter of weight, not admissibility and in admitting the RFLP evidence in this case.

Issue 3.

> Whether the District Court erred in admitting the PCR results performed on brain tissue discovered inside Moore's camper?

Moore maintains that the PCR testing AGTC conducted on the piece of brain tissue was done improperly and that the test results were therefore unreliable. Accordingly, Moore contends that the PCR test results failed to meet the threshold test for admissibility under Daubert. Moore makes the following challenges

24

to the reliability of the PCR analysis: (1) the thermal cycler failed to meet the proper working order requirement; (2) the proper procedures were not followed; (3) Tom Wahl, the laboratory technician who conducted the PCR testing was unqualified, and therefore Dr. Schanfield, the genetics expert could not base his testimony concerning the PCR test results upon Mr. Wahl's testimony; and (4) PCR analysis is not sufficiently reliable for forensic use.

In its ruling on the admissibility of this evidence, the District Court found that the proffered evidence met the threshold test for admissibility, and that Moore's challenges were questions of weight for the jury to determine. We agree, and as explained in detail below, Moore's objections do not negate the reliability of the PCR analysis itself. Rather these questions go to the weight of the evidence.

1. Thermal Cycler

Moore first challenges the thermal cycler, the heating device used in the DNA amplification process, on the following grounds: (a) the instrument was not assembled properly; (b) the brand of thermal cycler used was not the brand recommended by the manufacturer of the Cetus AmpliType Kit, (the particular PCR testing kit used in this case); and (c) AGTC used a different temperature for the denaturation phase of the DNA testing than recommended by the manufacturer of the testing kit.

The sole objection Moore raises concerning the "assembly" of the thermal cycler is that it did not have an external monitoring

25

system as was required by the users guide for the Perkin-Elmer thermal cycler. In response to Moore's concern that AGTC did not have an external monitoring system, Tom Wahl, the lab technician who conducted the PCR testing on the piece of brain tissue, testified that AGTC did not use the Perkin-Elmer thermal cycler but a BIOS BSC 100 thermal cycler which monitors temperature by using an internal probe. Wahl also explained that if the thermal cycler overheated the DNA sample, it could destroy the TAQ polymerase, and if the temperature was too low, there would be inadequate or no denaturation of the DNA.

In response to Moore's allegation that the brand of thermal cycler was not the brand recommended by the manufacturer of the Cetus AmpliType Kit, Dr. Schanfield, the laboratory director of AGTC, testified that there was no requirement that AGTC use any specific thermal cycler. In addition, Dr. Wheeler, whose research duties include adapting the Cetus AmpliType Kit for clinical use, testified that there were a variety of thermal cyclers on the market, some of which "produce similar and sometimes better results than the Perkin-Elmer Cetus machines [the machine recommended by the manufacturer]." Finally, Moore's own expert acknowledged that one reason Cetus recommended the Perkin-Elmer thermal cycler over other brands was because Cetus had a financial interest in the Perkin-Elmer machine. We conclude that Moore's challenge to the PCR evidence based on the brand of machine used did not render the PCR results inadmissible.

Moore's argument that AGTC used a different temperature for

26

the denaturation phase of the DNA testing than recommended by the manufacturer of the testing kit was also adequately explained by the State's experts. All the experts agreed that the temperatures at which the PCR process is conducted are critical. Dr. Schanfield echoed Mr. Wahl's testimony and explained that if the temperature gets too hot during the cycling procedure the TAQ polymerase would be destroyed. If the temperature does not get hot enough, the DNA will not separate and amplification will not occur. In either event, there would be no result.

Moore complains that AGTC ran the denaturation phase of the PCR analysis at $93^\circ$ Celsius, plus or minus two degrees, when the Cetus kit specified that the phase be conducted at a temperature of $94^\circ$ Celsius, plus or minus two-tenths of one degree. Once again, Dr. Schanfield provided an adequate explanation for this difference, by stating that AGTC had to consider the elevation of its laboratory in Denver when setting the appropriate temperature for the thermal cycler.

2. Proper Procedures

Moore argues that the most critical error by AGTC was its failure to follow its own protocol when it did not retest the sample of brain tissue which did not amplify. Moore claims it was AGTC's policy to amplify a sample twice, and AGTC's failure to follow its own protocol should have resulted in the mandatory exclusion of the PCR analysis evidence.

Moore relies on State v. McDonald (1985), 215 Mont. 340, 697 P.2d 1328, to support his position that AGTC's failure to use

27

proper procedures results in a mandatory exclusion of the evidence. In McDonald, the defendant was convicted of DUI based in part on a blood alcohol test report and testimony concerning the report. McDonald, 697 P.2d at 1330. This Court reversed and remanded the conviction finding that there was inadequate foundation for the report's admission, because it did not conform to the statutory and administrative rule requirements concerning blood alcohol testing. We held that a defendant charged with a DUI was entitled to have a proper foundation laid which incorporated the administrative rules on proper test procedures. McDonald, 697 P.2d at 1331-32.

However, Moore's reliance on McDonald is unpersuasive. AGTC did not fail to follow its protocol, nor has Moore alleged or established the omission of a procedure created by statute or administrative rule for the admission of PCR analysis evidence.

The testimony showed that AGTC received two samples of the piece of brain tissue, sample A, and sample B. Mr. Wahl put both samples through the PCR procedure, however, sample B did not amplify. Mr. Wahl testified that sample size permitting, it was AGTC's policy to amplify the DNA extract or sample twice. However, Mr. Wahl also explained that if a second amplification procedure would use up all of the sample, AGTC would not amplify it twice because "[w]e [AGTC] strive at all times to maintain at least half of the sample for referee analysis." Mr. Wahl also testified that if AGTC amplified the samples a second time, they would have used up "most if not all, of the extract, not allowing any extract for referee analysis."

28

We conclude that Moore's challenges concerning AGTC's failure to retest the brain tissue sample go to the weight of the evidence, and not its admissibility.

### 3. Testimony of Tom Wahl and Dr. Schanfield

Moore argues that Tom Wahl, who performed the PCR testing procedure for AGTC, is unqualified to perform the PCR testing, and consequently Dr. Schanfield should not have been allowed to render his expert opinion on Mr. Wahl's test results. Moore primarily criticizes the proficiency tests Mr. Wahl conducted, and maintains that the results of the proficiency tests show, among other things, contamination in some test results and an inability to get reproducible results. The District Court allowed Mr. Wahl to testify at trial as to the lab protocols performed and Dr. Schanfield then interpreted the results for the jury.

Rule 702, M.R.Evid., governs the testimony of expert witnesses. That rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

The determination of whether a witness is qualified rests within the sound discretion of the trial court, and such a determination will not be disturbed on appeal absent a showing of abuse of discretion. State v. Evans (1991), 247 Mont. 218, 228-29, 806 P.2d 512, 519. The degree or extent of a witnesses' qualifications affects the weight of the expert's testimony, not its admissibility. Evans, 806 P.2d at 519. citing, State v. Martin

(1987), 226 Mont. 463, 736 P.2d 477. Furthermore, cross-examination is the shield to guard against unwarranted opinions. Evans, 806 P.2d at 519, citing, Stewart v. Casey (1979), 182 Mont. 185, 193, 595 P.2d 1176, 1180.

The record clearly reveals that Mr. Wahl is qualified to testify as an expert witness on the basis of both his educational background and his experience. In fact, Moore's only challenge to Mr. Wahl's qualifications goes to the results of Wahl's proficiency tests, not Mr. Wahl's lack of education, training or experience. We conclude that Moore failed to demonstrate that Mr. Wahl was not qualified as an expert on the basis of the proficiency test results. Moore's challenges to the proficiency testing go to the weight of the evidence, not its admissibility.

Even if Moore's argument concerning the error rate of Mr. Wahl's proficiency tests is meant to challenge the reliability of the PCR analysis, this argument would not result in exclusion of the PCR evidence. Under the Daubert test, the error rate is only one factor in the non-exclusive list of factors to be considered in addressing the admissibility question. Bonds, 12 F.3d at 560. We conclude that Moore did not demonstrate that Mr. Wahl's rate of error was unacceptable in the scientific community, or rendered the test results inadmissible.

Based on Moore's contention that Mr. Wahl was unqualified to testify, he argues that Dr. Schanfield should not have been able to interpret Mr. Wahl's test results. In light of our conclusion that Mr. Wahl was qualified to perform the PCR testing procedures and

30

that any alleged error in the proficiency tests did not render the testing procedure inadmissible, we conclude that Moore's argument is without merit.

Pursuant to Rule 703, M.R.Evid, experts can base their opinions on facts or data perceived by the experts, or made known to them at or before the hearing. In the instant case, the District Court found that Mr. Wahl did not have the qualifications to _interpret_ the PCR analysis results. Therefore, the State introduced evidence concerning the results of the PCR analysis through Dr. Schanfield. As is explained by Imwinkelried, Courtroom Criminal Evidence § 625 (2d ed. 1993), this method is well recognized.

> For example, a technician operates the X-Ray machine but is not qualified to interpret the results. Similarly, a police officer could qualify as an expert in the operation of a breathalyzer but would not have the requisite expertise to interpret the results. A physician or other expert would have to testify about the relationship between the alcohol content of the breath and the effect on the brain[.]

The District Court did not abuse its discretion in allowing Dr. Schanfield to rely on Mr. Wahl's PCR testing procedures in forming his opinion as to the test results.

4. PCR analysis is not sufficiently reliable for forensic purposes.

In his final challenge to the PCR analysis evidence, Moore contends that PCR analysis in general is not sufficiently reliable for forensic use. In support of his argument Moore primarily relies on a report prepared by the Committee on DNA Technology in Forensic Science, under the auspices of the National Academy of

31

Sciences. The report, entitled DNA Technology in Forensic Science (National Acadamy Press 1992) (hereinafter DNA Technology), was prepared by a committee of scientists and jurists to address the status of forensic DNA typing. State v. Cauthron (Wash. 1993), 846 P.2d 502, 504.

According to the report, "one of the most serious concerns regarding PCR-based typing is contamination of evidence samples with other human DNA." DNA Technology at 65. Moore contends that this potential for contamination makes the PCR analysis evidence unreliable and, therefore, inadmissible.

In the instant case, the record reveals that the experts handling the piece of brain tissue were aware of the possibility of contamination, and took appropriate steps to avoid and detect contamination of the specimen. Although Moore raises the issue of the potential for contamination, he fails to demonstrate whether contamination of the tissue actually occurred.

Moore also presented a theory that the piece of brain tissue could have been something other than human tissue which was contaminated by Brisbin's blood. Moore's expert Dr. Blake, a plant geneticist at Montana State University, conducted an experiment wherein he placed human blood onto a piece of deer brain. Dr. Blake then put the sample through a PCR process to amplify the DQ-alpha gene. The results of the test showed that the human blood placed upon the deer brain would amplify the DQ-alpha gene.

While Moore's experiment does support his theory that the piece of brain tissue found in the camper may have been deer brain

32

which had been covered with some of Brisbin's blood, the theory does not prove Moore's underlying contention, that PCR analysis is unreliable for forensic use and, therefore, inadmissible. Moore's experiment simply provided the jury with an alternate explanation to the piece of brain tissue, i.e., that Brisbin may not have been the donor of the piece of brain tissue.

Moore's challenge to the reliability of PCR analysis in forensic use was recently addressed by the Oregon Court of Appeals. The Oregon Court noted:

> There is, however, disagreement among experts about whether the PCR method is appropriate for forensic use. The disagreement centers primarily on the fact that samples obtained at the crime scene are often produced and recovered under adverse conditions that can result in various forms of contamination before the sample ever reaches a laboratory. The potential for contamination is present in the collection, identification and retention of most forms of forensic type evidence. The potential for contamination presents an "open field" for cross-examination at trial, but does not indicate that the PCR method is inappropriate for forensic use.

State v. Lyons (Or.App. 1993), 863 P.2d 1303, 1309.

The District Court determined that the PCR analysis evidence met the initial test for admissibility, and that Moore's arguments were a matter of weight for the jury to determine. We agree with the trial court, and hold that the District Court did not abuse its discretion in admitting evidence concerning the PCR analysis.

Issue 4.

Whether the District Court erred in denying Moore's motion to suppress a statement he made to Sgt. Burns while being transported in a patrol car?

On November 23, 1990, Moore was brought into the West Yellowstone police station for an interview. Four officers were

33

present, Sheriff C. Ron Cutting, Lt. Bill Slaughter, Lt. Bob Pearson, and Sgt. Kevin Burns. After being advised of his Miranda rights, Moore signed a waiver of the rights and agreed to answer questions without the presence of counsel.

During the interview, Moore stated that he had used a .357 revolver to shoot at some rats in his camper.[1] Moore also told the officers that they were welcome to have the .357 revolver. The interview concluded after Moore invoked his right to counsel for the third time. Sgt. Burns then drove Moore home to pick up the gun. Moore could not drive himself home as the police had just seized his pickup. En route, Sgt. Burns made the following statement, "[Y]ou know, make sure you don't do anything to yourself. You know, nothing is that bad." Moore responded, "if I did something to myself then we'd never find Brad."

Moore moved to suppress the statement he made while in the patrol car. The District Court denied the motion, concluding that Moore was not in custody and that his statement was entirely voluntary and was not made as part of a custodial interrogation. Therefore, this Court must determine if the District Court correctly concluded that: (1) Moore was not in custody at the time he made the statement to Burns; and (2) Burns had made no effort to interrogate Moore. State v. Flack (1993), 260 Mont. 181, 185, 860 P.2d 89, 92.

---

[1]. The District Court granted Moore's motion to suppress the statements he made at this interview. This Court affirmed the District Court's suppression ruling in State v. Moore (1991), 250 Mont. 254, 818 P.2d 835.

34

In support of his claim of error, Moore characterizes the interrogation technique used by the officers at the police station as a suicide colloquy; i.e., the officers used Moore's confused mental state to convince him that if he did not confess, he was likely to commit suicide. According to Moore, the statement Burns made in the patrol car was simply a continuation of that technique.

In determining whether a custodial interrogation has occurred, this Court examines whether a "reasonable person" would feel free to leave. State v. Staat (1991), 251 Mont. 1, 6, 822 P.2d 643, 646. If a reasonable person does not feel free to leave, then the examination is custodial. Staat, 822 P.2d at 646. The determination of what constitutes custodial interrogation is made on a case-by-case basis. Staat, 822 P.2d at 646.

In this case, the facts clearly indicate that Moore was in custody at the time he made the statement to Sgt. Burns. Moore had been taken into the police station for questioning, where he was advised of his Miranda rights. During the interview Moore offered to provide the officers with a gun he had at home. After the interview concluded, Sheriff Cutting asked Sgt. Burns to go with Moore to get the gun. Burns then told Moore, "[w]e might as well get in my vehicle." Moore was not allowed to drive his vehicle home as it had just been seized.

Having concluded that Moore was in custody while riding in the police car, we must next determine whether Moore was interrogated by Sgt. Burns after Moore had invoked his right to counsel. Flack, 860 P.2d at 92.

35

In Rhode Island v. Innis (1980), 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297, the United States Supreme Court addressed the meaning of "interrogation" under the holding of Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 692. The United States Supreme Court held that interrogation included express questioning and persuasion techniques while a subject was in custody. Innis, 446 U.S. at 299, 100 S.Ct. at 1689, 64 L.Ed. 2d at 307. According to the Court, interrogation includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301, 100 S.Ct. at 1689-90, 64 L.Ed.2d at 307-08. The focus of the inquiry is on the perception of the suspect and not the perceptions of the police. However, the Court recognized that the police should not "be held accountable for the unforeseeable results of their words or actions," and therefore, limited the definition of interrogation to "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Emphasis in original) Innis, 446 U.S. at 301-02, 100 S.Ct. at 1690, 64 L.Ed.2d at 308.

Applying this test to the case before us, we conclude that Moore was not interrogated within the meaning of Miranda. First, although Sgt. Burns was present during the initial interview, he did not participate in any direct questioning of Moore. Second, we are not convinced that the officers conducted the interviews using a suicide colloquy. Sheriff Cutting testified that there was no

36

plan or tactic used to interview Moore, other than to confront him with new evidence. Finally, Burns testified that he had known Moore for years, and had made the statement in the patrol car out of concern for Moore's well being. Burns had no reason to know that Moore would respond to the statement in the manner that he did.

Given these facts, Sgt. Burns' statement cannot be characterized as reasonably likely to elicit an incriminating response. Although the District Court was incorrect in concluding that Moore was not in custody, it was correct in determining that Sgt. Burns made no effort to interrogate Moore, and that any statements Moore made during this time were voluntary and admissible at trial. Where the result reached by the district court is correct, we will uphold it upon appeal regardless of the reasons given for the result. Kephart v. Portmann (1993), 259 Mont. 232, 236, 855 P.2d 120, 122-23. We therefore affirm the District Court's denial of Moore's motion to suppress.

Issue 5.

Whether the District Court erred in denying Moore's motions for a change of venue and motion for individual voir dire on the issue of pretrial publicity?

Moore moved for a change of venue on April 24, 1991, alleging that the extensive pretrial publicity his case had received made it impossible for him to receive a fair and impartial trial in Gallatin County. The District Court denied this motion in a Memorandum Opinion filed on January 16, 1992, wherein the court found that up to that point in time, the "[p]ress reports of this

37

case have been uniformly professional, free of bias, prejudice, inflammatory matters, and comment." The court however reserved the right to monitor and re-examine the issue during selection of the jury panel. Moore renewed his motion for a change of venue on September 4, 1992. The District Court denied the motion in a written order dated September 24, 1992.

Moore also moved the court for individual voir dire on the issue of pretrial publicity. Although the District Court originally granted the motion, it later reversed itself, denied the motion, and required that voir dire be conducted in open court. On appeal, Moore maintains that the District Court erred in denying his motions. .

This Court will reverse a district court's denial of a motion for change of venue or motion for individual voir dire only upon a showing of an abuse of discretion. State v. Sunday (1980), 187 Mont. 292, 298, 609 P.2d 1188, 1192.

Criminal defendants have a constitutional right to a trial by an impartial jury, and failure to provide an impartial tribunal is a violation of due process. U.S. Const. amend. VI, Mont. Const. Art. II, Sec. 24. Additionally, § 46-13-203(1), MCA, permits a defendant to move for a change of venue when "there exists in the county in which the charge is pending such prejudice that a fair trial cannot be had in the county."

A defendant is entitled to a change of venue if it appears there are reasonable grounds to believe that prejudice exists and that by reason of the prejudice, there is a reasonable apprehension

38

that the accused cannot receive a fair and impartial trial. State v. Link (1981), 194 Mont. 556, 559-60, 640 P.2d 366, 368. A defendant seeking a change of venue on the basis of prejudicial pretrial publicity must prove two elements: (1) that the news reports were inflammatory; and (2) that the news reports actually inflamed the prejudice of the community to an extent that a reasonable possibility exists that the defendant may not receive a fair trial. State v. Bousquet (1991), 248 Mont. 53, 56, 808 P.2d 506, 508. (Citations omitted.)

The test requires us to examine whether the publicity was of sufficient inflammatory nature so as to generate a widespread belief among the community of the defendant's guilt. State v. Miller (1988), 231 Mont. 497, 505, 757 P.2d 1275, 1280. This Court has characterized inflammatory publicity as:

> editorializing on the part of the media or any calculated attempt to prejudice public opinion against [defendant] or to destroy the fairness of the pool from which [the defendant's] prospective jurors would be drawn.

State v. Nichols (1987), 225 Mont. 438, 444, 734 P.2d 170, 173-74. (Citation omitted.)

Moore alleges that from December 7, 1990, until the time of trial, potential jurors were exposed to approximately one article a week pertaining to Moore and the homicide. These numbers, according to Moore, show the pervasiveness of the publicity. Moore alleges the newspaper articles were inflammatory for a number of reasons. Moore claims that the media: emphasized the grief experienced by the Brisbin family; printed numerous inflammatory remarks from law enforcement officials and prosecutors; and

39

portrayed the DNA evidence as "a scientific savior" for the State's case.

Upon reviewing the numerous newspaper articles submitted by Moore, we do not agree that the newspaper reports were inflammatory. Although a few reports mentioned Rene Brisbin's grief, it is misleading to characterize the reports as emphasizing the family's grief. Regarding the press coverage of the allegedly inflammatory remarks made by the State, the remarks published were statements made during pretrial proceedings or statements concerning the investigation of the case. There was no editorializing on the part of the press in reporting these statements.

As to the publicity covering the DNA evidence, given the fact that Moore's case presented the first instance DNA testing was to be used in a Montana homicide trial, it is not surprising that the press would extensively cover this story. In addition, after reviewing the articles concerning the DNA evidence, we conclude that the media presented a balanced view of the issue. For example, the Bozeman Daily Chronicle printed an article on March 10, 1991, entitled "Invisible Crime Clues." The article states that "DNA fingerprinting has been viewed as virtually foolproof in linking suspects with crimes." However, the article later reports "[b]ut DNA testing is far from perfect. Attorneys have begun challenging the process and succeeding, causing the scientific community to reexamine the procedure." Given the balanced reporting of the DNA issue, we conclude that these articles cannot

be characterized as inflammatory.

Moore also alleges that the media coverage of the suppression hearings was prejudicial to his case. While facially it appears that publication of suppressed statements is prejudicial to a defendant's case, mere allegations of prejudicial pretrial publicity are an insufficient basis on which to grant a motion for a change of venue. Rather, defendant must show that the publicity actually inflamed community prejudice to such an extent that the defendant is denied a fair trial. State v. Ritchson (1982), 199 Mont. 51, 54, 647 P.2d 830, 832.

Moore maintains that the public opinion survey he had commissioned demonstrates that he was denied a fair trial. The survey questioned 106 persons in Gallatin County concerning the media's coverage of Moore's case. The survey results showed that 85.8 percent of the respondents had been exposed to media coverage concerning the case. Approximately thirty percent (30.2%) said they had an opinion, while 50.9 percent said they did not have an opinion and 15.1 percent said they did not know. Therefore, two-thirds of the respondents either had not formed an opinion or did not know if they had formed an opinion about the case as a result of the media coverage.

Moore relies on State v. Paisley (1983), 204 Mont. 191, 663 P.2d 322, as authority for the proposition that even where a survey does not overwhelmingly indicate the likelihood that a defendant will not receive a fair trial in the county, a defendant may still be entitled to a change of venue. However, Paisley is

41

distinguishable because in that case, the media coverage was inflammatory, while in the instant case it was not.

The defendant in Paisley, was charged with both misdemeanor and felony sexual assault. A trial on the misdemeanor charge was held in justice court prior to his being tried on the felony charges. Paisley, 663 P.2d at 323. The trial in justice court received extensive coverage, and upon the justice court's return of a guilty verdict, the local newspaper reported that the justice court judge told the defendant: "[T]he evidence presents you as being guilty of more than the particular offense charged." In addition the paper reported that "[The judge] said he was amending the formal charge to include misdemeanor charges against [the defendant] that could have resulted from the incidents detailed in the testimony of the witnesses." The witnesses were the alleged victims of the pending felony charges. Paisley, 663 P.2d at 324. As previously discussed, our review of the newspaper articles submitted by Moore evidences that the pretrial publicity in this case was not inflammatory. Unlike the media coverage in Paisley, the newspaper reports did not present Moore as being guilty of the crimes charged before he received his trial.

Even Moore concedes in his brief that "[t]he results of Dr. Floyd's survey did not overwhelmingly indicate, one way or the other, that Mr. Moore would or would not receive a fair and impartial trial in Gallatin County." Moore's acknowledgement that the survey results were inconclusive combined with the fact that the pretrial publicity was not inflammatory demonstrates that Moore

42

was not denied his right to a fair trial.

Moore also contends that because over one-third of the panel immediately excused themselves after being asked if they could not sit fairly on the case for any reason demonstrates the extent and prejudicial nature of the pretrial publicity. However, the record fails to support this claim. Two of the jurors stated the reason they were unable to serve was because they knew someone in the Brisbin family. One juror stated he had knowledge of the case due to his extensive dealings with law enforcement. And two others indicated they could not convict the defendant of homicide unless the State produced the victim's body.

The jurors were questioned about their exposure to pretrial publicity. While most indicated they had read or heard something about the case, they all stated they would base their decisions only upon the evidence they received from the witnesses and exhibits presented at trial.

Living, as we do, in a society which is continuously inundated with news coverage by the print and broadcast media, it is doubtful that most members of the community will not share some knowledge of, or about, a locally high-profile crime, and the various persons allegedly involved in its commission or in its investigation. Given the inevitable conflict with the media's constitutional right of free speech, the public's constitutional right to know, and the accused's constitutional right to a fair trial, it remains the task of the district court, in such cases, to scrupulously examine the evidence supporting a motion for change of venue to insure that the

43

jurors who will ultimately decide the guilt or innocence of the accused are fair minded and uninfluenced by what they may have seen, heard or read. That conclusion must necessarily be based upon not only the jurors' responses in voir dire, but also on a careful analysis of the quantity and content of the pretrial publicity. Each case is unique and must be decided on its own merits. Bourquet, 808 P.2d at 508. While this was a difficult case, we are nevertheless satisfied that the trial judge conscientiously considered this issue, and that despite the pervasiveness of the media coverage, it was generally balanced and fair. We conclude the jurors who decided Moore's fate were not disposed to guilt or innocence by what they may have seen, heard or read in the media.

We further conclude that Moore failed to establish either that the news reports were inflammatory or that the reports actually inflamed the prejudice of the community. Therefore, we hold that the District Court did not abuse its discretion in denying Moore's motions for a change of venue.

Finally, Moore argues that the District Court erred in denying his motion for individual voir dire on the issue of pretrial publicity. The District Court determined that the need for individual voir dire could be assessed during the jury selection process, and permitted individual voir dire upon counsel's request.

In deciding whether to close voir dire, this Court has held:

Closed voir dire has been found unnecessary where the publicity is factually accurate and contains the essential facts of the crimes which would ultimately be presented to the jury anyway. The trial judge's plan to

44

question individual veniremen in chambers should the need arise would have been adequate had it been properly implemented. This is especially true since the veniremen were cautioned that if they had strong opinions about the case, they should notify the judge. (Citation omitted.)

Nichols, 734 P.2d at 174.

In the instant case, the court found that the publicity was "uniformly professional, free of bias, prejudice, inflammatory matters, and comment." The court also allowed individual voir dire upon counsel's request. Therefore, we hold that the District Court did not abuse its discretion in denying Moore's motion for individual voir dire.

### Issue 6.

Whether the District Court erred when it denied Moore's motion for a new trial on claims of juror misconduct?

On January 19, 1993, Moore moved for a new trial alleging, among other things, juror misconduct as a result of two contacts Moore had with juror Tina Coulston during trial which occurred outside of the courtroom. During trial, Ms. Coulston told some of the other jurors about these contacts. Ms. Coulston also related a bad dream she had about Moore to some of the other jurors just prior to deliberations.

After learning that Ms. Coulston made these remarks to other jurors, Moore moved for a new trial two months after the verdict. Moore alleged in his motion that "one of the jurors expressed an opinion during deliberations to the other jurors that she was being stalked by the defendant in the course of the trial."

Pursuant to Moore's motion, a hearing was held where Ms.

45

Coulston testified that on two different occasions, Moore had come out to the Gallatin County airport cafe and ordered coffee. Ms. Coulston testified that she acted as Moore's waitress on both occasions, as she was the only waitress on duty, and that she did not talk to him on either occasion. Ms. Coulston also testified the contacts made her uncomfortable, but that she did not feel threatened. Ms. Coulston testified that she never used the term stalking when explaining the situation, and did not know where the term came from. In addition, the other jurors who testified concerning the stalking allegation related that Ms. Coulston did not use the term "stalking."

The following testimony from the hearing on Moore's motion for a new trial, evidences that Ms. Coulston did not relate to other jurors or anyone else, that she believed Moore was stalking her, following her, or that she felt threatened by the incidents.

> Q: [By defense counsel] During the trial, do you recall telling Patrick Fleming or saying in his presence at a lasagna party that Larry Moore was stalking you, following you, or watching you?
>
> A: [By Ms. Coulston]  I did not say that.
>
> . . . .
>
> Q:  Did you express concern regarding your belief that you were being watched by Larry Moore?
>
> A:  No.
>
> Q:  You did not express concern to the other jurors?
>
> A:  Just that he was there and he made me uncomfortable.
>
> . . . .
>
> Q:  And you told two different groups of jurors during the trial when they were sitting as active jurors in this

case Mr. Moore was watching you, isn't that correct?

A: I did not say he was watching me. I told them about the incident at the airport.

Q: An you indicated by your tone of voice and by your expressions and by your gestures that you felt threatened by Mr. Moore, isn't that correct?

A: No.

Q: And as a matter of fact, Miss Coulston, you did feel threatened by Mr. Moore, didn't you?

A: No, I did not.

When testifying about relating her dream to the other jurors, Ms. Coulston's stated that she could not remember the specifics of her dream, just that she had a bad dream. However, Juror Knight testified that Ms. Coulston related to other jurors that "[Ms. Coulston] dreamed that we all found Larry guilty, and he had a gun and he shot Mr. Jent and you, [Jent's co-counsel] and he grabbed her out of the jury box and ran off with her."

After considering the testimony at the hearing, the District Court denied Moore's motion finding no evidence to support the allegation of juror misconduct concerning either the "stalking" claim or in relating the dream. We agree.

The decision whether to grant a new trial is left to the sound discretion of the trial judge. Absent an abuse of discretion, we will not overturn a denial of a motion for a new trial on appeal. State v. Arlington (1994), 51 St.Rep. 417, 427, 875 P.2d 307, 321; State v. Staat (1991), 251 Mont. 1, 9-10, 822 P.2d 643, 648.

Initially, we address the State's argument that the District Court was without jurisdiction to consider Moore's motion for a new

47

trial, because he failed to file his motion within 30 days of the verdict as is required by statute. Section 46-16-702, MCA, provides in pertinent part:

> **Motion for a new trial.** (1) Following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice.
> (2) The motion for a new trial must be in writing and must specify the grounds for a new trial. The motion must be filed by the defendant within 30 days following a verdict or finding of guilty and be served upon the prosecution.

Moore argues that our decision in State v. Redcrow (1990), 242 Mont. 254, 790 P.2d 449, provides two exceptions to the 30 day time limit: (1) if the motion was filed within a reasonable period of time after the verdict; and (2) if the crime is of a serious nature. However, in Redcrow we noted that those factors did not _require_ the district court to entertain the motion, but nevertheless, we agreed to address the issue as a result of the district court's extensive consideration of the motion. Redcrow, 790 P.2d at 452. Similarly, in the instant case, because the District Court gave extensive consideration to Moore's motion for a new trial, and because this is a serious case, we shall address the merits of the motion.

A defendant's right to a fair and impartial jury is guaranteed by both our state and federal constitutions. Mont. Const. Art. II, Sec. 24; U.S. Const. amend. VI. Moore argues that when a defendant moves for a mistrial based on ex parte contact, the defendant is afforded a presumption of prejudice. We disagree.

Where a defendant moves for a mistrial based on juror misconduct resulting from ex parte contact, the defendant must

48

demonstrate "actual prejudice" in order to receive a new trial. State v. Hage (1993), 258 Mont. 498, 503, 853 P.2d 1251, 1254, citing, United States v. Madrid (9th Cir. 1988), 842 F.2d 1090, 1094-95, cert. denied 488 U.S. 912, 109 S.Ct. 269, 102 L.Ed.2d 256. The Ninth Circuit Court in Madrid distinguished between cases where ex parte contact provided "extraneous information" to the jury, and ex parte contact which did not pertain to "any fact or controversy or any law applicable to the case." The court held that the defendant must prove actual prejudice in cases which do not involve the unauthorized submission of extraneous information to the jury. Madrid, 842 F.2d at 1093.

Here the District Court concluded that the contact did not result in the jury receiving any extraneous information. The court summarized its ruling as follows:

> There had been no discussion between the defendant and Miss Coulston. There had been no discussion of the case between Miss Coulston and any of the other jurors. What really occurred was that Mr. Moore was at the Gallatin County airport to pick up or deliver his sister or his mother, who were in attendance at one time or another during the course of this trial, and saw Ms. Coulston there.
> So it's going to be the Court's ruling with respect to that issue that it is insufficient and inadequate as a matter of law to impeach the jury verdict or to cause this Court to grant a new trial or to cause this Court to set aside the jury verdict in this case.

We agree that no extraneous information was submitted to the jury as a result of Ms. Coulston's relating the incidents. There was testimony that the defendant and the juror had seen each other at the Gallatin County airport. The extent of the contact was that Ms. Coulston acted as Moore's waitress. Moore kept his head down

49

and did not engage Ms. Coulston in any conversation.

We conclude that Ms. Coulston did not discuss any fact in controversy or any law applicable to the case with either Moore or other jurors. Ms. Coulston merely mentioned an incident that had occurred to her about which she was concerned.

In alleging that Ms. Coulston related to other jurors that she felt Moore was stalking her during trial, we first observe that the evidence does not support the accusation. Moreover, it appears that Moore is attempting to take advantage of his own conduct. During the trial Moore went to the airport cafe on two occasions and ordered food or coffee from Ms. Coulston. Ms. Coulston had to serve Moore as she was the only waitress on duty. Ms. Coulston related to other members of the jury that she was concerned by the contact. However, there is no evidence in the record that the "stalking" term came from the juror, or that she made remarks that Moore had "stalked" her during trial.

The law will not allow a defendant to purposefully create grounds for a mistrial. "To hold otherwise would provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so, either inside or outside the courtroom." Hammond v. United States (D.C.App. 1975), 345 A.2d 140, 141. We agree with the reasoning of the Supreme Court of Maine which held:

> [A] defendant who seeks to prejudice his own case by [contact with a juror], and keeps that contact secret until an unfavorable verdict is returned, cannot claim to be prejudiced by his own misdeed.

State v. Nielson, (Me. 1989), 552 A.2d 543, 545.

50

Although he was permitted an evidentiary hearing to prove his allegations of juror misconduct, Moore failed to prove that juror misconduct occurred, or that his right to a fair trial was prejudiced. Rather, it appears that Moore was simply trying to take advantage of his own acts.

Moore also contends that it was juror misconduct for Ms. Coulston to have related her dream about Moore to the jury. The State counters that the dream is beyond the scope of inquiry pursuant to Rule 606(b), M.R.Evid.

Rule 606(b), M.R.Evid., provides in pertinent part:

**Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. . .
However, as an exception to this subdivision, a juror may testify . . . as to any matter or statement concerning only the following questions, whether occurring during the course of the jury's deliberations or not: (1) whether extraneous prejudicial information was improperly brought to the jury's attention; or (2) whether any outside influence was brought to bear upon any juror. . .

This Court has held that "[a] juror's physical, mental, and emotional condition is inherent in the verdict, and the effect of such a condition on a juror's vote is within the prohibition of Rule 606(b)." Hage, 853 P.2d at 1257, citing State v. DeMers (1988), 234 Mont. 273, 277-278, 762 P.2d 860, 863. After an extensive search, this Court was unable to find any authority indicating that a juror's relating a dream to other jurors

51

constituted either impermissible extraneous prejudicial information, or an outside influence. Therefore, we hold that any inquiry into Ms. Coulston's dream is prohibited pursuant to Rule 606(b), M.R.Evid., as it relates to her mental process, and because it cannot be characterized as an exception to the rule.

During the trial Ms. Coulston approached the bailiff, and related that Moore had been out at the airport cafe. Ms. Coulston explained she was concerned about the contact, and thought it was very peculiar that Moore would travel all the way to the airport to eat. The bailiff asked Ms. Coulston whether Moore had talked to her. Upon learning that Moore did not say anything, the bailiff told Ms. Coulston that she (the bailiff) would bring the matter to the judge's attention, and would let Ms. Coulston know if the court had any further concerns. The bailiff related the matter to the judge, and the matter never came up again during the trial or deliberations. Moore argues that the District Court erred by failing to immediately notify counsel of the situation after Ms. Coulston contacted the bailiff.

Moore alleges that had he learned of this incident during trial, he would have questioned Ms. Coulston and the other jurors during trial to determine what she had conveyed to them concerning the incident. If the defense determined Ms. Coulston had related that she felt she was being stalked by Moore, the defense would have asked the court to remove Ms. Coulston from the jury and to seat one of the alternate jurors.

Moore's claims are without merit. He was afforded a hearing

after trial but could not demonstrate prejudice. As stated by the United States Supreme Court in Rushen v. Spain (1983), 464 U.S. 114, 119-20, 104 S.Ct. 453, 456, 78 L.Ed.2d 267, 273-74.

> When an ex parte communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties. The prejudicial effect of a failure to do so, however, can normally be determined by a post-trial hearing. The adequacy of any remedy is determined solely by its ability to mitigate constitutional error, if any, that has occurred. Post-trial hearings are adequately tailored to this task. (Citations omitted.)

The United State Supreme Court addressed the issue of juror misconduct as a result of ex parte contact in Smith v. Phillips (1982), 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78. There a juror applied for a job as an investigator with the district attorney's office during the defendant's trial. The prosecution did not disclose this information until after the verdict had been rendered, and the defendant moved to set aside the verdict. Smith, 455 U.S. at 212-13, 102 S.Ct. at 943-44, 71 L.Ed.2d at 83-84. The trial court denied the motion after holding a post-trial hearing, at which the defendant failed to demonstrate prejudice. Smith, 455 U.S. at 213-14, 102 S.Ct. at 944, 71 L.Ed.2d at 84. The defendant argued to the United States Supreme Court that jurors' testimony could not be relied upon to determine whether they were impartial, and maintained that the law must impute bias to jurors in these situations. Smith, 455 U.S. at 215, 102 S.Ct. at 944-45, 71 L.Ed.2d at 85. The Supreme Court disagreed, stating, "[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove

53

actual bias." Smith, 455 U.S. at 215, 102 S.Ct. at 945, 71 L.Ed.2d

at 85. The Court also stated:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that . . . held in this case.

Smith, 455 U.S. at 217, 102 S.Ct. at 946, 71 L.Ed.2d at 86.

In conclusion, here, the trial judge held a hearing on Moore's motion for a new trial, and Moore failed to demonstrate that his right to a fair trial was prejudiced as a result of alleged juror misconduct. We therefore hold that the District Court did not abuse its discretion in denying Moore's new trial motion on the basis of juror misconduct.

## Issue 7.

Whether the District Court erred when it prohibited Moore from impeaching the verdict with juror testimony?

Among the reasons included in Moore's motion for a new trial was his allegation that during deliberations, certain jurors expressed opinions based on personal knowledge respecting the characteristics of a .357 magnum handgun. According to Moore, one of the jurors told the other jurors that he knew a .357 magnum handgun could not be fired in rapid succession. Moore argues that as a result of the juror relating his opinion, the other jurors

54

concluded that Moore's story concerning Brisbin shooting himself was inherently incredible.

The District Court refused to allow Moore to question the jurors about the discussion concerning the handgun, ruling that it was part of the jury dynamics and therefore any inquiry into the matter was precluded by Rule 606(b), M.R.Evid. On appeal Moore alleges that the District Court should have allowed juror testimony concerning this issue. According to Moore, the juror's comment concerning his knowledge of the .357 handgun is similar to the situation where a juror conducts an experiment outside of the courtroom and then relates the experiment's outcome to the other jurors. Therefore, Moore argues he should have been allowed to question the jurors regarding this matter pursuant to the exceptions to Rule 606(b), M.R.Evid. We disagree, and conclude that Moore is asking this Court to allow inquiry into the internal mechanisms of the jury's decision-making process.

Rule 606(b), M.R.Evid., precludes inquiry regarding the internal mechanisms and processes the jury used to deliberate and reach a verdict. However, "[w]here external influence is exerted on the jury or where extraneous prejudicial information is brought to the jury's attention, juror [testimony] can be the basis for overturning the judgment if either party was thereby deprived of a fair trial." Hage, 853 P.2d at 1257.

Moore's characterization of the discussion about the gun as an external influence is erroneous. As we stated in Hage:

> [K]nowledge and information shared from one juror to
> another or others is not an extraneous influence. 'Jurors

55

are expected to bring to the courtroom their own knowledge and experience to aid in the resolution of a case.... For the juror to have considered the credibility of defendant's expert witness within the parameters of his own experience and background is insufficient to qualify as an exception to Rule 606(b).'

Hage, 853 P.2d at 1257-58, quoting State v. DeMers (1988), 234 Mont. 273, 277-78, 762 P.2d 860, 863.

In DeMers, this Court rejected the defendant's argument that one of the jurors influenced the other jurors with his expertise regarding the study of bones. We held that a juror's possession of knowledge of the human body did not fall under any of the exceptions to Rule 606(b), and we affirmed the district court's refusal to allow juror testimony concerning the matter. DeMers, 762 P.2d at 863. Similarly, a juror's consideration and sharing of his personal knowledge of a handgun cannot be characterized as an external influence or extraneous prejudicial information. There is no evidence that any juror conducted any out-of-court experiments in this case. We therefore hold that the District Court was correct in concluding that inquiry into this matter was precluded pursuant to Rule 606(b), M.R.Evid.

## Issue 8.

Whether the District Court erred when it denied Moore's motion for a judgment of acquittal alleging there was insufficient evidence to convict him of deliberate homicide?

Moore moved for a judgment of acquittal alleging that there was insufficient evidence to convict him of deliberate homicide. Moore advances three arguments to support his motion: (1) the State failed to prove that Moore purposely or knowingly caused Brisbin's

56

death; (2) the evidence failed the sufficiency analysis for circumstantial evidence; and (3) the only evidence which proves Brisbin's death is the piece of brain tissue which was found in Moore's camper, and the State did not prove beyond a reasonable doubt that the brain tissue was human.

The decision whether to direct a verdict of acquittal lies within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. The trial court should grant a motion for a directed verdict of acquittal only when there is no evidence to support a guilty verdict. State v. Bromgard (1993), 261 Mont. 291, 293, 862 P.2d 1140, 1141. The standard of review for a judgment of acquittal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Mergenthaler (1994), 263 Mont. 198, 203, 868 P.2d 560, 562. We address each of Moore's arguments in turn.

1. Mental State

Moore was charged with deliberate homicide, which requires the State to prove that Moore purposely or knowingly caused the death of Brisbin. Section 45-5-102, MCA. Moore claims that the record is bare concerning Moore's mental state at the time the homicide was committed.

Section 45-5-112, MCA, provides that "[i]n a deliberate homicide, knowledge or purpose may be inferred from the fact that the accused committed a homicide and no circumstances of

57

mitigation, excuse, or justification appear." While Moore recognizes this statute, he claims that it creates a presumption which unconstitutionally relieves the State of its burden of proving an element of the crime. However, it is well established that § 45-5-112, MCA, does not create a conclusive presumption but a permissive inference. The ultimate determination is left to the finder of fact. State v. Cowan (1993), 260 Mont, 510, 516-17, 861 P.2d 884, 888. We therefore reaffirm the constitutionality of § 45-5-112, MCA, and hold that there was sufficient evidence for the jury to conclude that Moore purposely or knowingly caused the death of Brisbin.

## 2. Circumstantial Evidence

While Moore recognizes that a person may be convicted upon circumstantial evidence alone, Bromgard, 862 P.2d at 1142, citing, State v. Atlas (1986), 224 Mont. 92, 95, 728 P.2d 421, 423, he maintains that "the facts and circumstances in evidence should be consistent with each other and the guilt of the defendant, and inconsistent with any reasonable theory of the defendant's innocence."

While this may be true, it is the jury's province to judge inconsistencies in the evidence and not a matter for the trial court to determine on a motion for judgment of acquittal. See, Bromgard, 862 P.2d at 1142. Furthermore, this Court has also held "[w]hen circumstantial evidence is susceptible of two interpretations, one supporting guilt and the other supporting innocence, the trier of fact determines which is most reasonable."

58

Bromgard, 862 P.2d at 1142, citing, State v. Tome (1987), 228 Mont. 398, 401, 742 P.2d 479, 481. Moore's allegation that the evidence was circumstantial and susceptible of different interpretations more properly goes to the weight of the evidence. We therefore conclude that Moore's argument that the circumstantial evidence was insufficient to prove Moore's guilt beyond a reasonable doubt is without merit, and hold that the District Court did not abuse its discretion in denying the motion for a judgment of acquittal on that basis.

## 3. Brain Tissue

Moore contends that the only evidence which proves Brisbin's death is the piece of brain tissue which was found in Moore's camper, and the State did not prove beyond a reasonable doubt that the brain tissue was human. Moore states that the experiment Dr. Blake conducted demonstrates that the DNA amplified by the PCR test could have been any human genetic material (i.e., not cerebellum tissue) on a substrate such as deer brain. In fact, Dr. Schanfield, the State's expert, readily admitted that deer brain mixed with human blood would amplify under the DQ-alpha system. Moore states that his theory that the piece of brain tissue was actually deer brain or other tissue which had been contaminated by Brisbin's blood is further supported by the fact that of the two samples of brain tissue, only one sample amplified. However, as we stated in issue three, Moore's theory concerning the brain tissue provided nothing more than an alternative theory for the jury's consideration. Moreover, we do not agree that the piece of

59

brain tissue is the only evidence of Brisbin's death. The record is replete with evidence of Moore's guilt. Brisbin disappeared on the morning of November 9, 1990, after meeting Moore at Bair's truckstop. Because Brisbin was a conscientious father and businessman, his disappearance was totally out of character.

Upon returning to West Yellowstone, on November 9, 1990, Moore developed a story that he last saw Brisbin climbing into a car on Interstate 90 with a woman driver. When confronted with incriminating evidence, Moore began to change his story, and eventually developed the story that Brisbin was drunk, threatening suicide, and had shot himself in the head after Moore struggled to get a gun away from him. Moore testified at trial that he initially lied about the facts surrounding Brisbin's disappearance because he thought Brisbin might want to return and take the job as undersheriff, which Brisbin had applied for before his disappearance, and the incident might jeopardize Brisbin's position.

Moore expended great efforts to destroy evidence in his camper, including removing bullet fragments, covering up bullet holes, and using a power washer to clean the interior of the camper. Attorney Larry Whitman and Sheriff Slaughter each received a letter purportedly from Brisbin. In the letter to Whitman, Rene Brisbin's name was misspelled, and it made reference to the alleged events which took place in the camper. Moore acknowledged that only he and Brisbin could have known what had occurred in Moore's camper on November 9, 1990. The signatures on the letters were

determined to be forgeries.

In addition, both serological and RFLP analysis of the muscle tissue found in the camper indicated that the muscle tissue was of human origin, and was consistent with having come from the biological father of the Brisbin children. The PCR analysis of the brain tissue also indicated that the tissue was human and consistent with the father of the children.

Without going into further detail, based on our review of the record, we conclude that the State presented a significant amount of evidence upon which a rational trier of fact could find Moore guilty beyond a reasonable doubt. Therefore, we hold that the District Court did not abuse its discretion in denying Moore's motion for a judgment of acquittal.

Issue 9.

Whether Moore was denied his right to a speedy trial?

Moore argues he was denied his right to a speedy trial as a result of the State's two interlocutory appeals. The State filed its first interlocutory appeal on April 25, 1991. The appeal was taken from the District Court's ruling which granted Moore's motion to suppress evidence of the taped interviews taken by law enforcement officials, and which reserved ruling on whether the State could use the suppressed evidence for impeachment. This Court affirmed the District Court's rulings in our opinion dated October 8, 1991. State v. Moore (1991), 250 Mont. 254, 818 P.2d 835.

On January 24, 1992, the State filed its second interlocutory

61

appeal. The State appealed from the District Court's order of January 16, 1992, suppressing evidence relating to the actions of Moore after the shooting of Brisbin, and the testimony of two potential witnesses. We reversed the District Court's suppression rulings on all issues. State v. Moore (1992), 254 Mont. 241, 836 P.2d 604. We issued our second opinion on August 20, 1992.

The right to a speedy trial in a criminal prosecution is guaranteed by the Sixth Amendment to the United States Constitution, and Article II, Section 24 of the Montana Constitution. State v. Stewart (1994), 51 St.Rep. 910, 881 P.2d 629, 632. Montana has adopted the test set forth in Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, to determine whether the right to a speedy trial has been violated. State ex rel. Briceno v. District Court (1977), 173 Mont. 516, 568 P.2d 162. The factors this Court must examine are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Barker, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; State v. Thompson (1993), 263 Mont. 17, 31-32, 865 P.2d 1125, 1134.

Moore relies on the United States Supreme Court decision United States v. Loud Hawk (1986), 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640, the seminal case on interlocutory appeal and speedy trial, to support his contention that he was denied his right to a speedy trial as a result of the State's two interlocutory appeals. Loud Hawk adopted the four-part test set forth in Barker to determine whether a defendant's right to a speedy trial was

62

violated.  Loud Hawk, 474 U.S. at 314, 106 S.Ct. at 655, 89 L.Ed.2d at 653.  However, after applying the Barker factors to the case before us, we conclude that Moore's right to a speedy trial was not violated.

Over one year and ten months (692 days) expired between Moore's arrest and trial, therefore, the length of the delay is presumptively prejudicial.  See, State v. Bartnes (1988), 234 Mont. 522, 527, 764 P.2d 1271, 1275 (175 day delay which was attributable mainly to the State found to be presumptively prejudicial); Thompson, 865 P.2d at 1135 (203 day delay presumptively prejudicial).  Because the delay is presumptively prejudicial, the remaining three factors must be considered.  In balancing the factors, no particular factor is determinative; all the factors must be weighed in light of the facts and circumstances of the case.  Thompson, 865 P.2d at 1134-35.

In assessing the second factor of the Barker test, the United States Supreme Court in Loud Hawk noted that different weights should be assigned to different reasons for delay, and that "[g]iven the important public interests in appellate review, . . . it hardly need be said that an interlocutory appeal by the Government ordinarily is a valid reason that justifies delay." Loud Hawk, 474 U.S. at 315, 106 S.Ct. at 656, 88 L.Ed.2d at 654.

Loud Hawk set forth several factors to be considered in determining whether to charge the government with the delay occasioned by its interlocutory appeals: the strength of the government's position on the appealed issue; the importance of the

63

issue in the posture of the case; and the seriousness of the crime. Loud Hawk, 474 U.S. at 315, 106 S.Ct. at 656, 88 L.Ed.2d at 654. If the issues raised by the government's interlocutory appeal were "clearly tangential or frivolous," the delay should be weighed heavily against the government. Loud Hawk, 474 U.S. at 315-16, 106 S.Ct. at 656, 88 L.Ed.2d at 654-55. However, when the government's conduct is reasonable, and there has been no showing of bad faith or dilatory purpose on the part of the government, delays occasioned by the government's interlocutory appeals should not weigh in favor of a defendant's speedy trial claim. Loud Hawk, 474 U.S. at 316, 106 S.Ct. at 656, 88 L.Ed.2d at 655.

Moore alleges that the State's motive for both appeals is "highly suspect." Moore suggests that the State filed its first appeal after being chastised by the District Court for having its case in disarray. Moore then implies that the State filed its second appeal in retaliation for the District Court sanctioning the prosecution by removing the lead counsel, Deputy County Attorney Marty Lambert, from the case. We conclude that Moore's contentions are without merit.

There is no indication in the record that the State chose to appeal as a delay tactic or in retaliation for being chastised or sanctioned by the District Court. The District Court itself was quoted as saying, "I don't think [the first appeal] was a time-consuming ploy on the part of the county attorney. They had legitimate grounds to file the appeal." Bozeman Daily Chronicle, "Judge says evidence rejected in Moore case won't cause delays",

October 8, 1991. We agree with the District Court that the first appeal was meritorious and, therefore, the appeal should not weigh heavily against the State.

The record also does not support Moore's allegation that the State filed its second appeal in retaliation for the trial court removing lead counsel from the case. The record shows that the District Court removed the deputy county attorney from the case after it had been informed that the State had filed its notice of appeal.

In addition, we reversed the trial court in the State's second appeal and "reversals by the Court of Appeals are prima facie evidence of the reasonableness of the Government's action." Loud Hawk, 474 U.S. at 316, 106 S.Ct. at 656, 88 L.Ed.2d at 655.

We conclude that there is no basis for Moore's allegation that the State's motive for its appeals was suspect, as there was no showing of bad faith or dilatory purpose on its part. Therefore, the reason for the delay should be resolved in favor of the State.

Regarding the third Barker factor, Moore made a timely assertion of his right to a speedy trial by raising the issue two times before the commencement of his trial. State v. Palmer (1986), 223 Mont. 25, 28, 723 P.2d 956, 959.

In considering the fourth factor, we must examine the interests of the defendant which may be prejudiced by a delay in coming to trial. These interests are: (1) pretrial incarceration, (2) anxiety and concern, and (3) impairment of defense. Barker, 407 U.S. at 532; Stewart, 881 P.2d at 633; Thompson, 865 P.2d at

65

1135.

Moore was incarcerated for approximately 90 days before his release on bail. Although incarceration is a serious matter, Moore was free on bail nearly all of the time between arrest and trial. Therefore, Moore cannot complain of prejudice resulting from pretrial incarceration. Stewart, 881 P.2d at 633.

The second interests we must consider, anxiety and concern, are difficult matters to prove. However, it must be kept in mind that the charge against Moore is one of the most serious which may be levied, and the mere fact it was filed will produce some anxiety and concern. Thompson, 865 P.2d at 1135. Moore failed to indicate how his anxiety and concern were aggravated as a result of the delay, and we decline to presume prejudice.

The most important consideration is whether the delay impaired or prejudiced Moore's defense. Moore claims he was financially devastated as a result of the protracted legal proceedings, and as a result, his defense suffered as he did not have enough funds to pay for his own experts at trial.

Again, however, the record fails to support Moore's allegations. After holding a hearing on Moore's motion to determine whether the State should pay for his experts at trial, the District Court found that Moore had remaining assets valued in excess of $160,000. The court determined that Moore was not indigent and denied Moore's motion. In addition, Moore indicated at the indigence hearing that his experts had been paid up to date, and his experts appeared and testified at trial.

66

In considering whether Moore's defense was prejudiced by the delay the District Court reasoned as follows:

> Here, Defendant has been free on bond for many, many months, has traveled in and out of the State of Montana to conduct his usual business affairs, has traveled outside Montana on family matters, and has consistently been available to work with his counsel on preparation of this case. No witnesses essential to the defense have died; the Defendant has had full discovery of prosecution evidence, and has had equal time to assemble his own evidence. Nothing about the delays which have occurred in this case can be reasonably attributed to State actions having the purpose of prejudicing the Defendant, and there are no allegations that evidence essential to the Defendant has been lost.

We agree with the District Court's conclusion that Moore did not suffer any prejudicial effect as a result of the delay in bringing the case to trial. Therefore, after balancing the four Barker factors, we hold that Moore was not deprived of his constitutional right to a speedy trial.

In conclusion, having carefully considered the lengthy transcript and the record in this case along with the briefs and arguments of counsel, we hold that the District Court did not commit reversible error on any of the issues raised by Moore in this appeal. Accordingly, his conviction of deliberate homicide is AFFIRMED.

                                                  _____
                                                           Justice

We Concur:

_____
Chief Justice

John Conway Harrison

67

_Karla M. Gray_

_William E. Hunt_

_[signature]_

_Jim Regnier_

Justices