JUSTICE NELSON
dissenting.
¶52 I dissent from the Court’s decision that Rules 9 and 13 of the Rules for Lawyer Disciplinary Enforcement (hereafter, simply referred to as Rules or Rule) do not deny a respondent attorney due process of law. I conclude and would hold that the rules fail in this regard and, accordingly, are violative of Montana’s Constitution, Article II, Section 17.1 also conclude and would hold that Rule 13 is unconstitutional as violative of Montana’s Constitution, Article II, Section 9.

*507
Introduction

¶53 Before commencing my discussion of the law, I want to make one thing unequivocally clear. My dissent should not be read as a criticism of the members of the Commission on Practice (COP), either past or present, or of any of the attorney investigators and special counsel who, with no compensation and little thanks, have and continue to unselfishly give of their time and talent to the cause of lawyer discipline in Montana. Quite simply, without the generous, voluntary contributions of these respected and dedicated members of the State Bar of Montana (Bar), the whole discipline system would collapse; we would not have what little we have now.
¶54 And that is part of the problem. As this dissent suggests, this Court has imposed too great a burden for lawyer discipline on the few members of the Bar willing to serve. The Bar has argued for reform; respected members of the Bar (one, a delegate to the Constitutional Convention) as amici curiae have argued for reform; the respondent attorneys in these cases and attorneys in other cases pending before the COP have argued for reform, yet we have ignored their pleas. Lawyer discipline in Montana is constitutionally deficient, not because of anything the COP or the Bar have done or have failed to do but, rather, because this Court, in the exercise of its constitutional authority under Article VII, Section 2(3), has mandated the use of an unconstitutional scheme for disciplining attorneys.
¶55 Whether to avoid what would, no doubt, be a politically unpopular Court-mandated Bar dues increase to fund needed reforms, or out of fear of having to rehear the instant cases and jeopardizing the numerous other disciplinary proceedings pending before the COP[1] we have refused to acknowledge and to rectify the glaring constitutional deficiencies in Montana’s disciplinary scheme that are patently obvious to nearly every organization and attorney who has appeared in these proceedings.
¶56 Indeed, I am dumb-founded by our decision. In 1996, after years of studying the current disciplinary system and after suggesting changes to rectify the obvious constitutional and practical infirmities it identified, the leadership of the Bar went “on the road” to promote to the membership a modest dues increase to fund some of the herein *508 after discussed needed improvements to this State’s lawyer disciplinary system. In support of that effort various members of the COP and this Court, this writer included, joined the band-wagon to pointedly argue to Montana’s attorneys the urgent need and legal necessity for these changes. Now, a mere three-plus years later — at a time when the COP continues to struggle with its heavy case load of lawyer disciplinary proceedings and at a time when the law supporting the mandate for these changes has been forcefully and eloquently argued by the respondent attorneys, by the Bar and by numerous other amici curiae — this Court’s support has evaporated. Go figure.
¶57 That we have failed to discharge our singular administrative responsibility to reform the system for lawyer discipline in this State is bad enough; that we have failed in our most solemn obligation as judges to support, protect and defend the constitutional rights of a whole profession — the very profession, ironically, that is sworn to defend the due process rights of every other citizen — is unforgivable. ¶58 Montana is the Last Best Place for many things. In terms of a constitutionally sufficient lawyer disciplinary system, however, Montana is simply last!

Discussion I. Rule 9

A. The American Bar Association Report

¶59 In 1992, this Court invited the American Bar Association (ABA) to consult on Montana’s lawyer regulatory system. An experienced and highly credentialed team from the ABA conducted interviews with persons involved with all facets of the regulatory system, including members of this Court, the Board of Governors (now Board of Trustees) and Executive Director of the Bar, Members of the COP, volunteer investigators and special counsel, respondents’ counsel, respondents, complainants, members of the client protection committee, members of the lawyer assistance program and members of the Bar generally. The team also reviewed internal office records and procedures of the COP and the client protection committee as well as the rules governing lawyer discipline, client protection and lawyer assistance. The team also received written comments from persons that it was unable to interview. Report on the Montana Lawyer Regulation System, at 2 (Nov. 1993) (hereafter ANA Report).
¶60 As a result of this study, the ABA issued an insightful and comprehensive report in November 1993. This report-the ANA Report — analyzed, discussed and made recommendations on all phases *509 of Montana’s regulatory system for lawyers including the need for creation of an office of disciplinary counsel, restructuring of the COP, reforming lawyer disciplinary procedures, sanctions, access to the disciplinary system, protection mechanisms (lawyer trust accounts), and other lawyer and client security matters not at issue here. The ABA Report is worth reading. It graphically points up the deficiencies in Montana’s lawyer regulation and disciplinary system and, of particular relevance to the matters under discussion, the ABA Report is severely critical of Montana’s procedures under Rule 9.
¶61 Not surprisingly, the majority gives theABAReport short shrift. However, portions of this study serve to focus the due process infirmities inherent in Montana’s disciplinary system which this Court has chosen to ignore. With apologies to the reader for the lengthy block quote, those parts of the ABA Report, because of their relevance and importance, are set out here:
I. CREATION OF THE OFFICE OF DISCIPLINARY COUNSEL
Recommendation 1: Appointment of Disciplinary Counsel
The Supreme Court should establish an Office of Disciplinary Counsel and appoint an attorney to serve as Disciplinary Counsel. The Disciplinary Counsel should have the duty to receive, screen, investigate and prosecute complaints of attorney misconduct in Montana. Disciplinary Counsel should have the authority to hire staff necessary to perform his or her duties and not rely on the use of volunteer investigators and prosecutors.
Recommendation 2: Staff in the Office of Disciplinary Counsel
Disciplinary Counsel should share one full-time assistant counsel, 2 full-time secretaries and part-time non-lawyer investigators as needed on a contract basis.
The Montana System
Montana is the only jurisdiction in the United States that has no professional staff employed in the investigation and prosecution of complaints against attorneys. The Commission on Practice handles a complaint at every stage in the process until final adjudication by the Montana Supreme Court. Volunteer investigators and special counsel from different geographical areas are called upon to investigate and prosecute cases.
Effects on the Montana System
Having the same group perform oversight and review functions at each stage in the process as well as conduct hearings and make find *510 ings, conclusions, and recommendations to the Supreme Court creates an appearance of unfairness, although no improprieties were found. It is difficult for any person to review complaints initially to determine whether they should be investigated, review them again after investigation to determine whether formal charges should be filed and then sit as an impartial adjudicator.
The use of volunteers to investigate and prosecute causes delay and inconsistency. Volunteers lack expertise in disciplinary enforcement. They are often not aware of the nuances of the rules of professional conduct or of all the procedural rules applicable in a particular situation, such as interim suspension or subpoena power, or are unsure how to apply these rules. The team learned there is also some resistance on the part of the volunteers to performing the investigative and prosecutorial function because of the time it takes away from their own practice and their lack of expertise. There was agreement among those interviewed by the team that the use of volunteer investigators and prosecutors is the weakest link in the lawyer disciplinary system. Many noted that investigators are not promptly appointed and that, once appointed, they do not promptly complete the investigation and report to the Commission. Often an attorney will agree to investigate a matter and then advise the Commission several months later that he or she is too busy to handle the matter. The Commission must then find another investigator.
The delay that results is harmful to the profession. As one Commission member stated, “To have a hearing on a serious matter one or two years after the complaint was filed is unfair to the complainant and the attorney involved. Justice is not served.”
The Recommendation
The team recommends that the Supreme Court appoint a full-time disciplinary counsel to screen, investigate and prosecute disciplinary complaints. The Supreme Court is already responsible for appointing the member of the Commission on Practice. The team believes that the disciplinary system should be controlled and managed exclusively by the Montana Supreme Court and agrees that the disciplinary system should continue to be separate from the state bar. In Recommendation 19, several suggestions are made regarding programs that can properly be managed by the state bar.
The team heard no complaint about any individuals who serve on the Commission on Practice. The recommendation to appoint full-time disciplinary counsel is in no way a relation on the quality of *511 service or the dedication of those individuals. Rather, the team believes that this structural change is needed because the capacity of the current system has been reached and will soon be exceeded. The system is overly dependent on too few people. Several Commission members noted that the amount of time it takes to handle Commission business, including meetings, phone calls from complainants and respondents, and review of files and hearings, is becoming prohibitive, especially for small or solo practitioners. The appointment of professional disciplinary counsel would reduce the workload for the Commission members making it possible for all types of persons to serve on it.
Several Commission members expressed concern that if a professional disciplinary counsel were appointed, the Commission would be totally removed from the preliminary decision-making process and that this would hamper the Commission’s ability to function as an agency of the Court. The team believes that the Commission on Practice should continue to be involved in the decision to file formal charges and suggests in recommendation 7 that the Commission divide into panels of three to review the recommendation of the disciplinary counsel after investigation.
ABA Report, at 9-11.
m. DISCIPLINARY PROCEDURES
Recommendation 6: Screening and Investigation
Disciplinary counsel should screen complaints and conduct an investigation when the facts alleged, if true, would constitute a violation of the Montana Rules of Professional Conduct.
Recommendation 7: Review Panels
The Commission on Practice should be divided into three person panels to review the recommendations of disciplinary counsel after investigation and decide whether to dismiss, issue a cautionary letter or private reprimand, or direct that formal charges be filed.
The Montana System
Currently all cases are referred to the full Commission for review after a complaint has been filed and the respondent has answered the complaint. No screening occurs. The files are given to individual Commission members for review. Each Commission member reports at the next meeting on the files he or she reviewed. The Commission reviews approximately 100-120 cases at each meeting with each member reporting on approximately 10 cases. The Commission deter *512 mines whether to dismiss the matter, issue a cautionary letter or a private reprimand, or assign the matter to a volunteer investigator. After the report from the volunteer investigator has been received, the Commission determines whether formal charges should be filed.
ABA Report, at 19.
Recommendation 9: HearingsHearings should be conducted by the nine Commission on Practice members who did not serve on the review panel that determined probable cause existed to file formal charges in the matter.
The Montana System
All members of the Commission sit as the hearing body after having reviewed all matters at the investigation and probable cause stages.
Effects on the Montana System
As discussed in Recommendation 1, the current system creates an appearance of unfairness.
The Recommendation
The Commission on Practice has argued that the current system of its involvement at each stage is appropriate because its role is to remain informed about and involved in all phases of the disciplinary process, acting as the “eyes and ears” of the Supreme Court in order to make appropriate recommendations to the Court, which remains ultimately responsible for lawyer discipline in the state. The team believes, however, that the separation of the prosecutorial and adjudicative functions is essential to maintaining a system that is and appears to be fair and one in which the public and the bar can have confidence. If the Court were to delegate additional authority to the Commission to impose some types of public discipline, which Commission members agreed is possible as the volume of complaints increases, the separation of prosecutorial and adjudicative functions will be required.
In order to keep the investigative and adjudicative functions separate, the members who sit on the review panel of a case should not participate on the hearing panel for that case. Thus, the team recommends that the nine Commission members who did not participate in the probable cause determination sit as the hearing body in the case.
An alternative utilized in a number of states would be for the Commission on Practice, composed of twelve members, to be divided into four panels comprised of two lawyers and one non-lawyer. After review by one panel of the Commission, a case would go to another three *513 member panel for hearing. This approach separates investigative and adjudicative functions of the Commission and makes scheduling of the hearing dependent on a smaller number of people.
ABA Report, at 23-24.

B. The Majority Opinion

¶62 The foregoing analysis and recommendations offered by the ABA Report could not be more germane to the controversy at bar.
¶63 As this Court’s opinion points out, Goldstein and Albers primarily assert that the procedures employed under Rule 9 by the COP violate their due process rights on the grounds that they “improperly vest both investigatory and adjudicatory functions in one body,” and therefore deny their right to an impartial tribunal. As one of the amici suggests, despite the Commission’s best efforts in this matter, its members “came into the hearing room with their minds made up.”
¶64 A fair and impartial tribunal is a basic guarantee of due process under both the United States and the Montana Constitution. See, e.g., State v. Moore (1994) 268 Mont. 20, 51, 885 P.2d 457, 477. Critical to any review of the Rules here is the principle that due process violations may be adjudged not only on the basis of actual harm — the lack of which the majority ultimately relies on for its decision — but also on the basis of the appearance or risk that potential harm or prejudice may occur due to an inherent flaw in the process itself. See Mayberry v. Pennsylvania (1971), 400 U.S. 455, 469, 91 S.Ct. 499, 507, 27 L.Ed.2d 532 (Harlan, J., concurring) (stating that “the appearance of even-handed justice ... is at the core of due process”). As previously stated, the failure of due process in Montana’s attorney disciplinary scheme does not lie with the COP or with the attorney investigators and special counsel, but, rather with the structural lack of due process afforded by the Rules themselves. Thus, the majority’s “no harm, no foul” approach does not solve the problem nor is this tack consistent with the standards of due process which we have articulated for tribunals in non-lawyer discipline cases. As we have stated, “any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias.” May v. First Nat. Pawn Brokers, Ltd. (1994), 269 Mont. 19, 24, 887 P.2d 185, 188 (quoting Commonwealth Coatings Corp. v. Continental Casualty Co. (1968), 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (emphasis added)).
¶65 In support of the respondents’ position, several amici have persuasively argued that without sufficient “walls of division” between *514 the investigative/prosecutorial and judicial functions of the COP, the actual threat or appearance of bias will persist under the current attorney disciplinary rules. See generally Lyness, M.D. v. State Board of Medicine (Pa. 1992), 605 A.2d 1204, 1209-10 (holding that a physician’s due process rights were violated by commingling of prosecutorial and adjudicatory functions within single multi-administrative board). Consequently, until such changes as those suggested in the ABA Report are implemented, the unfairness inherent in our own “commingling of prosecutorial and adjudicatory functions” in the COP, as presently structured, will never be corrected. The appearance of bias will continue to exist and with that appearance the failure of due process.
¶66 The respondents and amici also persuasively argue that Montana lawyers are not afforded the same measure of due process protection as are other professionals in Montana. The majority also summarily rejects this argument, concluding that Montana lawyers enjoy “more”protection in disciplinary proceedings than other professionals (a determination that I will address later). I agree with the respondents and amici.
¶67 Montana’s Administrative Procedure Act, §§ 2-4-101 through 711, MCA, and the statutes governing professional licensing, §§ 37-1-101 through 413, MCA, provide due process “walls of division” in the investigative, prosecutorial and adjudicative phases of the discipline process for other professions that are lacking in Montana’s attorney disciplinary system. Thus, other professionals in Montana are afforded a hearing examiner or “judge” assigned on the basis of his or her “expertise required for the particular matter,” under § 2-4-611(1), MCA, or an independent hearing examiner selected from the attorney general’s office or from another agency, under § 2-4-611(2), MCA. Other professionals have the right to move for disqualification of the examiner due to bias or lack of independence, under § 2-4-611(4), MCA. Other professionals are guaranteed that final decisions of a disciplinary board will be made by persons who did not serve on the “reasonable cause” screening panel, and that the preliminary investigators will not be permitted to participate in the subsequent hearing of a case, under § 37-l-307(l)(e), MCA.
¶68 These sorts of “walls of division” are an essential component of due process and are the centerpiece of the ABA Report’s recommendations. Unfortunately, this concept is also summarily dismissed by the majority. Even the low-impact suggestion of dividing the COP into panels comprised of two lawyers and one non-lawyer,' so as to separate *515 the investigative functions of one panel from the adjudicative functions of a different panel is rejected.
¶69 Rather, in concluding that the procedures set forth under Rule 9, do not impermissibly combine functions, the majority relies on this Court’s decision in Wyse — a 15-year old case which was decided under a completely different disciplinary scheme, i.e., the 1965 disciplinary rules.[2] According to the majority, the due process issues raised here, under the current 1983 rules, were presumptively addressed and resolved by our decision in Wyse. Our opinion states at ¶ 22 that: “the Court [in Wyse] specifically noted that the due process protections which it identified under the rules which controlled in Wyse continue to be provided under the then newly-adopted Rules on Lawyer Disciplinary Enforcement.”
¶70 I do not disagree that in Wyse the issue of whether the COP serving as “prosecutor, judge and jury” deprives an attorney of due process was raised by the respondent, just as it has been raised here. Wyse, 212 Mont, at 345,688 P.2d at 761. The problem with the majority’s reliance on Wyse is that once the separation of functions issue was clearly set out in that case, we disposed of it without actually addressing its merits.
¶71 We stated that “[ujnder both sets of rules, and particularly under the rules applicable to Wyse [the 1965 rules], the proceedings before the COP are designed to establish a record upon which this Court must act.” Wyse, 212 Mont. at 346, 688 P.2d at 762 (emphasis added). We continued our due process analysis by determining that the respondent attorney also had been afforded: 1) full right of representation by counsel, 2) confrontation of witnesses, 3) the adducement of evidence in his own behalf, and 4) the right to argue the merits on the *516 facts and law. Wyse, 212 Mont. at 346, 688 P.2d at 762. We then concluded:
Rather than depriving lawyers of due process, our rules provide for an orderly method of preserving to the attorney accused before the Commission, and later before us, his denials and defenses to the charges made against him in the widest latitude. We find no deprivation of due process affecting Wyse’s rights in this cause.
Wyse, 212 Mont. at 346, 688 P.2d at 762.
¶72 None of the foregoing due process rights which we discussed, however, even remotely implicated Wyse’s right to an impartial tribunal and the separation of investigative, prosecutorial and adjudicative functions under the 1965 — much less under the 1983 rules, where such “walls of division” do not exist. Even assuming that the elements of procedural due process addressed in Wyse apply to the current rules, the specific due process issue raised by Goldstein and Albers — whether the disciplinary rules deny their right to an impartial tribunal — has never been addressed by this Court, and Wyse cannot be relied on for that proposition, the majority’s conclusion to the contrary notwithstanding.
¶73 Moreover, a review of related decisions by this Court reveals that Wyse, in fact, followed a trend of ducking procedural due process analysis — a trend which the majority here seems willing to blindly follow. For example, in a rather lengthy and detailed decision issued prior to Wyse, this Court skirted the opportunity to render a comprehensive analysis of procedural due process as applied to the disciplinary rules. We. stated: “[a]ll- due process requires ... is the attorney be given a fair hearing before the Commission. He has received this.” Matter of Goldman (1978), 179 Mont. 526, 551, 588 P.2d 964, 978 (addressing the due process right to cross examine witnesses against the attorney). We then only peripherally addressed the issue of whether it was “improper for the chairman of the Commission on Practice to act as both the person in charge of the hearing, and as the trier of the facts.” We concluded that no prejudice occurred. Goldman, 179 Mont. at 552, 588 P.2d at 978. However, we reached this conclusion without any comprehensive review of procedural due process under either a federal or state law. See also In re Porter (1970), 156 Mont. 190, 190-91, 478 P.2d 866, 866-67 (addressing without reference to due process whether it was “unfair” for the Commission to first secure counsel to present the results of its investigation and then “sit in judgment on its merit”).
*517 ¶74 Simply put, neither Wyse nor any other Montana case has substantively addressed and properly resolved the separation of functions/impartial tribunal/due process issues raised by Goldstein and Albers in the instant proceeding. The majority’s reliance on Wyse for the contrary conclusion is, as Abraham Lincoln is reported to have observed, “as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death.” See Beamsley v. Commissioner of Internal Revenue (7th Cir. 1953), 205 F.2d 743, 748.
¶75 Even more disturbing is the majority’s reliance on the U.S. Supreme Court’s decision in Withrow v. Larkin (1975), 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712. For nearly 20 years, Withrow has been argued for the tenuous principle that combining investigatory functions with adjudicative functions does not, “without more,” deny due process in attorney disciplinary proceedings. See, e.g., In re Davis (Ariz. 1981), 628 P.2d 38, 40 (citing Withrow and concluding that it was not “unfair” for an attorney disciplinary committee chairman to initiate and then participate in a formal hearing). Attorney disciplinary proceedings, however, were not even mentioned in Withrow, nor did the Court cite to any of its own case law concerning attorney disciplinary proceedings in its decision.
¶76 Rather, as the majority here acknowledges, the Withrow Court upheld the constitutionality of an administrative disciplinary system for Wisconsin physicians, a system entirely regulated by Wisconsin’s state legislature. Therefore, Withrow does not specifically address the unique “quasi-criminal” process by which states’ judicial branches discipline attorneys — a unique classification which the Court itself established prior to the Withrow decision. See In re Ruff\alo (1968), 390 U.S. 544, 551, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117 (recognizing that such proceedings are neither criminal nor civil, but are “adversary proceedings of a quasi-criminal nature”), modified on other grounds, (1968), 392 U.S. 919, 88 S.Ct. 2257, 20 L.Ed.2d 1380. See also Tweedy v. Oklahoma Bar Ass’n (Okla. 1981), 624 P.2d 1049, 1053 (acknowledging the Withrow holding, and stating that in “contrast to the principles which affect administrative agencies, due process is offended when a judicial institution functions both as an organ of enforcement and adjudication); Razatos v. Colorado Supreme Court (10th Cir. 1984), 756 F.2d 1429, 1435 (identifying attorney disciplinary proceedings as “definitely judicial rather than administrative in nature”).
¶77 This Court, like the Oklahoma Supreme Court in Tweedy and most other states, possesses original and exclusive jurisdiction in all *518 matters involving the admission of persons to the bar and sole responsibility for disciplining unprofessional and unethical conduct of its members. See Wyse, 212 Mont. at 345-46, 688 P.2d at 762 (citing Article VII, Section 2(3) of the Montana Constitution). The legal profession in this country, as noted by Chief Justice Marshall in 1824, has always been one regulated by the judiciary itself. See Ex parte Burr (1824), 22 U.S. (9 Wheat.) 529, 530, 6 L.Ed. 152.
¶78 As an arm of this Court, the COP is necessarily bound by all precedents regarding the impartiality of the judiciary in relation to prosecutorial functions. Therefore, “[c]oncentrating the powers of judge and prosecutor in the same person or body poses an unreasonably high risk of compromising the protected and cherished value of judicial detachment and neutrality.” Tweedy, 624 P.2d at 1053 (citations omitted). Although factually distinguishable from the matter at bar, the underlying principles expressed in Tweedy relative to the Oklahoma attorney disciplinary process remain the same: “[vjesting prosecutorial duty in a judge is incompatible with the Constitution’s command for an untrammeled exercise of adjudicative function.” Tweedy, 624 P.2d at 1053 n.8 (citations omitted).
¶79 This critical distinction addressed in Tweedy is precisely why Withrow should not be applied to attorney disciplinary proceedings. Unfortunately, that has not been the case. According to the rather misleading reasoning of Withrow, because judges in criminal matters “issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed it,” and then the same judge presides over the defendant’s trial, this combination of “investigative” and “adjudicative” functions does not, “without more,” violate due process. See Withrow, 421 U.S. at 56-58, 95 S.Ct. at 1469-70 (stating that where the same agency makes the “initial charge or determination of probable cause and the ultimate adjudication” in “tandem” does not result in a procedural due process violation). This same illustration is relied on by the majority here. See ¶ 25. That does not make the analogy any less faulty, however.
¶80 A judge determines probable cause and issues an arrest warrant for the plain and simple reason that the Constitution requires that certain functions in the criminal process be kept separate, and not combined. Unlike the COP (the “trial tribunal”) in Montana’s present disciplinary scheme, a judge does not investigate criminal activities and then file or direct the filing of criminal charges on the ba *519 sis of the investigation. A judge does not decide who should be arrested. Rather, the prosecutor — a member of the executive branch of government — performs these investigative and charging functions. It is the prosecutor who requests the issuance of an arrest warrant from the neutral and detached magistrate who has determined only that probable cause supports the charge and the issuance of the warrant. While the same judge who made the probable cause determination may ultimately preside over the trial of the criminal case, the judge does not have a vested interest in the outcome by reason of the judge’s having investigated the case and having determined that, or what charges should be filed in the first instance. In fact, whether the case comes to trial at all, is plead out, or is dismissed altogether, are basically prosecutorial, not judicial, decisions. See State ex rel. Fletcher v. District Court (1993), 260 Mont. 410, 415, 859 P.2d 992, 995. Furthermore, unless the defendant waives his constitutional right to a jury trial, the accused’s guilt will not even be decided by the judge.
¶81 Moreover, as the U.S. Supreme Court has often stated, “[t]he prominent place the warrant requirement is given in our decisions reflects the basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of Government.” Arkansas v. Sanders (1979), 442 U.S. 753, 759, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (emphasis added) (citation omitted). Similarly, we have recognized the same principle in our own jurisprudence in stating that probable cause and the scope of a search must “be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.” State ex rel. Townsend v. District Court (1975), 168 Mont. 357, 363, 543 P.2d 193, 195 (quoting Johnson v. United States (1948), 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436).
¶82 Indeed, the illustration used by the Court in Withrow does not even mesh with its own jurisprudence. As noted already, eight years prior to Withrow, the U.S. Supreme Court explicitly recognized an attorney’s basic right to procedural due process in a disciplinary proceeding. Ruffalo, 390 U.S. at 550, 88 S.Ct. at 1226. Specifically, the Ruffalo Court held that the absence of “fair notice as to the reach of the grievance procedure and the precise nature of the charges” deprived the attorney of his procedural due process. Ruffalo, 390 U.S. at 552, 88 S.Ct. at 1226. See also Cafeteria & Restaurant Workers Union *520 v. McElroy (1961), 367 U.S. 886, 895, 81 S.Ct. 1743, 1748-49, 6 L.Ed.2d 1230 (stating that “consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved”).
¶83 Since Ruff alo was decided, the U.S. Supreme Court has not revisited due process violations specifically concerning state attorney disciplinary proceedings. Unfortunately, however, the skewed logic of Withrow has made its way into the due process jurisprudence of numerous state courts that have addressed the same issue presented here. See, e.g., People v. Varallo (Colo. 1996), 913 P.2d 1, 4-5 (following Withrow and finding no per se due process violation in combination of investigative and adjudicative functions in attorney disciplinary proceedings, and citing to similar decisions that relied on Withrow from California, Connecticut, Kansas, Michigan, Utah, and Wyoming).
¶84 However, a closer look at many of the states that have adopted Withrow reveals that, even in those jurisdictions, the “walls of division” — as suggested here by the ABA Report, the respondents and by amici — have been implemented to maintain the appearance of impartiality. See, e.g., Varallo, 913 P.2d at 4 (noting that “[n]o member of the hearing board or hearing panel can exercise investigative or prosecutorial functions because of the separation between the inquiry panel and hearing panel”). Rather, it remains, that
Montana is the only jurisdiction in the United States that has no professional staff employed in the investigation and prosecution of complaints against attorneys. The Commission on Practice handles a complaint at every stage in the process until final adjudication by the Montana Supreme Court.
ABA Report, at 9.
¶85 Additionally, in joining these states, the majority fails to acknowledge those courts which have carefully delineated elements of due process specifically for attorney disciplinary proceedings. See Wilburn Brewer, Jr., Due Process in Lawyer Disciplinary Cases:From the Cradle to the Grave, 42 S.C.L. Rev. 925 (1991) (identifying seven elements of due process in attorney disciplinary proceedings). See also In re Robson (Alaska 1978), 575 P.2d 771 (discussing right to neutral decision-maker and holding that counsel associated with either the prosecution or defense of attorney disciplinary proceeding should not be present during deliberations); State v. Turner (Kan. 1975), 538 P.2d 966 (discussing right to public hearing); People v. Morley (Colo. *521 1986), 725 P.2d 510 (identifying right to call and cross-examine witnesses); In re Meade (Wash. 1985), 693 P.2d 713 (examining right to counsel); Kentucky Bar Ass’n v. Shewmaker (Ky. 1992), 842 S.W.2d 520 (discussing right to pretrial discovery and taking of depositions); Matter of Jaques (E.D.Tex. 1997), 972 F.Supp. 1070 (requiring burden of clear and convincing evidence).
¶86 Similarly, in In re Schlesinger (Pa. 1961), 172 A.2d 835, the Pennsylvania Supreme Court, relying on the U.S. Supreme Court’s decision in In re Murchison (1955), 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942, expressly ruled that the combination of the functions of prosecutor, judge and jury in an attorney disciplinary proceeding violated due process. One of the concerns addressed by the Pennsylvania Court was that the Committee on Offenses (like the COP in Montana) appointed counsel to prosecute on its behalf. Schlesinger, 172 A.2d at 840. The court stated:
Here, a member of the bar, charged with unprofessional conduct by a bar Committee on Offenses, was prosecuted on the Committee’s complaint before a Subcommittee, composed of three members of the Committee, sitting as the trial tribunal. In such a procedure, so contrary to traditional American judicial concepts, unfairness was, ipso facto, inherent; it was fraught with the possibility of temptation to each member of the trial tribunal to favor, consciously or unconsciously, the prosecuting body which appointed him and of which he was a member. The record as a whole contains a reasonable basis for doubt as to whether impartiality on the part of the members of the tribunal was completely absent and suggests an unsympathetic predisposition toward the appellant.
Schlesinger, 172 A.2d at 841. The Schlesinger court concluded that an actual “predilection to favor one side over the other is not required in order to vitiate a judicial proceeding as being violative of due process.” Schlesinger, 172 A.2d at 841. Rather, the respondent need merely show that a “possible temptation” exists. Schlesinger, 172 A.2d at 841.
¶87 Likewise, once the faulty logic of Withrow is discarded, our own case law clearly points to the necessity for separating the investigative, prosecutorial and adjudicative functions in our system of disciplining lawyers. For example, in State v. Wilson (1994), 266 Mont. 146, 879 P.2d 683, we concluded that a search warrant issued by a justice of the peace was invalid because he had traveled with a sheriff to recover evidence of the crime and had discussed the evidence and investigation with the sheriff. Wilson, 266 Mont. at 149, 879 P.2d at 684-85. *522 We ruled that by becoming a member of the “investigatory team,” the justice of the peace could no longer make a neutral and detached evaluation of evidence. Wilson, 266 Mont. at 149, 879 P.2d at 684-85. See also Matter of Sorini (1986), 220 Mont. 459, 464, 717 P.2d 7, 11 (Sheehy, J., dissenting) (addressing administrative hearing process and stating that the “most elemental notions of due process ought to tell us that objectivity is impossible when one party owns both the prosecutor and the judge”). See also, Townsend, supra.
¶88 While the majority extolls the adequacy of due process provided under Montana’s attorney disciplinary scheme, a closer look demonstrates how the failure to separate functions destroys, if not the fact, at least the perception of impartiality. Under our disciplinary rules, the COP may upon its own volition order an investigation into an attorney’s misconduct. Rule 9A. If not satisfied with the results of this investigation — akin to a finding that no probable cause exists warranting arrest — the COP may nevertheless institute a formal disciplinary proceeding, and then appoint a “special counsel” to file a complaint with the COP. Rule 9C. At the direction of the COP, the special counsel, whose role can be likened to that of a prosecutor, sets forth “the charges with sufficient clarity and particularity so as to inform the respondent of the alleged misconduct.’’Rule 9C. Subsequently, the OOP’s presiding officer — either the chairperson or another member of the COP appointed by the chair — sits as judge at the hearing, with the authority to “rule on all motions, objections, and other matters presented in connection with such hearing.” Rule 9C.
¶89 That the foregoing combines the functions of adversary-investigator/prosecutor with neutral and detached judicial/decision-maker is obvious. As the ABA Report observed:
Having the same group perform oversight and review functions at each stage in the process as well as conduct hearings and make findings, conclusions, and recommendations to the Supreme Court creates an appearance of unfairness, although no improprieties were found. It is difficult for any person to review complaints initially to determine whether they should be investigated, review them again after investigation to determine whether formal charges should be filed and then sit as an impartial adjudicator.
ABA Report, at 9.
¶90 In short, under Montana’s lawyer disciplinary rules, the “judge” (COP) has the power to direct the “police” (investigator) to investigate a suspect (the respondent attorney), then tell the “prosecutor” (spe *523 cial counsel) what charges to bring, and then, even against the advice of both the “police” and the “prosecutor,” order that the suspect be brought to trial. The “judge” then decides the “guilt” of the accused on the charges it ordered filed.
¶91 Such a scheme simply does not and cannot afford attorneys subject to discipline with the neutral and detached decision-maker that due process requires. Following the reasoning suggested by the courts in Tweedy and in Schlesinger, as well as the notion that the judicial decision maker cannot be part of the “investigatory team” as we stated in Wilson, it is clear that the disciplinary procedures established under Rule 9 violate the right to due process of law guaranteed to attorneys under Article II, Section 17 of Montana’s Constitution.
¶92 Moreover, the fact that we have now chosen to march lockstep with the U.S. Supreme Court and certain of our sister jurisdictions in applying the contrary logic of Withrow does not alter the fact that we have utterly failed to provide the respondents here, and all Montana lawyers subject to discipline, with the “most exacting demands of due process of law.” Law Students Civil Rights Research Council, Inc. v. Wadmond (1971), 401 U.S. 154, 174, 185, 91 S.Ct. 720, 731, 737, 27 L.Ed.2d 749 (Black and Douglas, JJ., dissenting) (stating that members of a state bar “should not be disciplined ... without full and unquestioned due process of law and protection of all their constitutional rights .... before an unquestionably impartial tribunal”). Indeed, for a Court that is defiantly proud of providing more protection to our citizens under Montana’s Constitution than they might enjoy under the federal constitution, we have completely abrogated our responsibility to interpret Article II, Section 17 in that fashion, choosing, instead, to rely on the logic of a U.S. Supreme Court case that did not even involve due process in the context of unique, quasi-criminal attorney disciplinary proceedings.
¶93 Montana attorneys subject to discipline are entitled to no less due process than are administrative agency employees, pursuant to §§ 2-4-101 through 711, MCA, and other licensed professionals in Montana pursuant to § 37-1-101 through 413, MCA. I would hold the procedures under Rule 9 which fail to separate the adjudicative function from the investigative and prosecutorial functions of the COP and which, thus, fail to guarantee an impartial tribunal are per se violative of the due process clause of Montana’s Constitution, Article II, Section 17, and are, therefore, unconstitutional.

*524
II. Rule 13

¶94 Along the same lines, I also disagree with our decision as to Rule 13. The majority concludes that Rule 13’s confidentiality requirements, which prevent an accused attorney’s access to investigation information made prior to filing a formal complaint, do not violate due process. Specifically, Rule 13A provides:
Confidentiality. All disciplinary proceedings which are prior in time to the filing of a formal complaint with the Clerk of the Supreme Court and service upon the respondent as provided in Rule 11A of these rules, and all documents in connection therewith shall be confidential.
¶95 The majority summarily concludes at ¶ 42 that “any evidence relating to portions of an informal complaint not included in the formal charges filed against an attorney is not relevant, much less important, to the respondent attorney’s preparation to meet the charges at the formal hearing.” Yet, the majority then suggests at ¶ 43 that Rule 13 may necessarily be abridged: “any exculpatory evidence which was filed before the formal complaint and which relates to matters eventually included in the formal complaint must be disclosed to the respondent attorney.” As written, the Rule simply does not require such a disclosure.
¶96 This obvious contradiction between the actual language of Rule 13 and our apparent recognition of the due-process necessity for disclosure of exculpatory information is “resolved” by our review of the Commission’s files and our conclusion that no exculpatory evidence could be found. No doubt our determination in that regard will be of great comfort to Goldstein and Albers (and to future attorneys who may be the beneficiaries of our similarly magnanimous in camera review). The point is, the plain language of Rule 13 does not guarantee that exculpatory information contained in pre-formal complaint files will be available to the accused attorney. Due process is offended by that fact, alone. And, it bears repeating that, for the purposes of due process, actual harm need not be shown. Mayberry, 400 U.S. at 469, 91 S.Ct. at 507; Schlesinger, 172 A.2d at 841.
¶97 Of even greater import, however, is the fact that Article II, Section 9 of Montana’s Constitution requires that matters filed with the COP — whether pre-complaint or post complaint be available for inspection by the accused attorney. The guarantees provided to citizens, including attorneys, under the “right to know” provision of Montana’s Constitution are as binding upon this Court and its disciplinary arm, *525 the COP, as on any other branch or agency of government. In fact, we stated in Associated Press v. Board. of Public Educ. (1991), 246 Mont. 386, 391, 804 P.2d 376, 379, that “[fjirst and foremost, is the realization that the Constitution is the supreme law of this State. Its mandate must be followed by each of the three branches of government.” (Emphasis added). It is, thus, appropriate to begin by discussing this mandate.[3]
¶98 Article II, Section 9 of the Montana Constitution provides:
Right to know. No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure. (Emphasis added).
My research reveals no Montana case law ruling on the applicability or inapplicability of this constitutional provision to the judicial branch or, more specifically, to the proceedings and deliberations of this Court and, hence to the COP. Therefore, I turn to the rules of constitutional construction.
¶99 In resolving disputes of constitutional construction, this Court applies the rules of statutory construction. Under those rules, the intent of the framers of the Constitution is controlling and that intent must first be determined from the plain meaning of the words used. Butte-Silver Bow Local Gov’t v. State (1989), 235 Mont. 398, 403, 768 P.2d 327, 330 (citation omitted). Moreover, under these rules, if the language is clear and unambiguous, no further interpretation is required. Lovell v. State Comp. Mut. Ins. Fund (1993), 260 Mont. 279, 285, 860 P.2d 95, 99 (citation omitted). The courts may not go further and apply any other means of interpretation, Tongue River Elec. Coop. v. Montana Power Co. (1981), 195 Mont. 511, 515, 636 P.2d 862, 864 (citation omitted), nor may a judge insert into a constitutional provision what has been omitted or omit what has been inserted. See § 1-2-101, MCA.
¶100 Applying these well-settled rules of constitutional construction, it is clear that the plain language of Article II, Section 9, does not exempt this Court, much less its disciplinary arm, from the provi *526 sion’s mandate. Rather, Montana’s constitutional “right to know” unambiguously covers the deliberations of all public bodies of state government. That includes this Court and the COP.
¶101 Nonetheless, even ignoring the clarity of Article II, Section 9, and the dictates of our constitutional construction jurisprudence, the proceedings of the 1972 Constitutional Convention also lead to the conclusion that the “right to know” requirements do not apply exclusively to the legislative and executive branches of state government and its subdivisions to the exclusion of the judicial branch.
¶ 102 In point of fact, the delegates to the Constitutional Convention amended the language of what became Article II, Section 8 of the Montana Constitution, which gives the public the right to participate in the operations of governmental agencies, on Delegate Berg’s motion, so as to exclude the judicial branch. See Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, at 1663-67 (1981) (comments of Delegates Berg, Dahood, and McNeil). Notwithstanding that these same delegates discussed the language of what became Article II, Section 9 of the Montana Constitution on the same afternoon that they amended the language of what became Article II, Section 8, they did not even discuss amending the language of what became Article II, Section 9, so as to exclude the judicial branch. See Verbatim Transcript, at 1667-1680.
¶103 Delegate Berg, however, subsequently moved to amend the language of what became Article II, Section 9, out of his concern that the phrase “public bodies” could be interpreted to include juries, grand juries, or the deliberations of this Court. Verbatim Transcript, at 2499-2501. Delegate Dahood stated that he agreed with Delegate Berg and that the committee was “not trying to upset any traditional rule of procedure with respect to anything within the judiciary.” Notwithstanding, Delegate Dahood stated that he would not amend the section as Delegate Berg had suggested. Delegate Berg then stated in his closing statement in support of his motion that “my purpose in asking to delete the word[s] ‘bodies or’ is to eliminate the potential interpretation that it might include juries, grand juries, [or] Supreme Court deliberations.” Verbatim Transcript, at 2501. Despite Delegate Berg’s concerns, his motion failed. Verbatim Transcript, at 2501.
¶104 Thus, even though Delegate Berg expressed the same concern with regard to what became Article II, Section 8, and what became Article II, Section 9, the delegates amended only the language of what became Article II, Section 8, so as to exclude the judicial branch. More *527 to the point, the delegates declined to amend the language of what became Article II, Section 9, so as to exclude the judicial branch even though faced with the same concern that prompted them to amend what became Article II, Section 8.
¶105 Hence, not only the plain language but also the constitutional history of these companion provisions of the Montana Constitution show that Article II, Section 9, is broader than Article II, Section 8. Article II, Section 9, gives the public the right to observe the deliberations of all public bodies and agencies while Article II, Section 8, gives the public the right to participate only in the operations of agencies. That, of course, begs the question whether this Court is a “public body.” The answer to this question is undeniably “yes.”
¶106 In Common Cause v. Statutory Committee (1994), 263 Mont. 324, 329, 868 P.2d 604, 607, we noted that the rights, which Article II, Section 9, guarantees, are protected and implemented primarily through Montana’s open meeting statutes, codified at §§ 2-3-201 through 221, MCA. One of these statutes, § 2-3-203(1), MCA, provides:
All meetings of public or governmental bodies, boards, bureaus, commissions, agencies of the state, or any political subdivision of the state or organizations or agencies supported in whole or in part by public funds or expending public funds must be open to the public. (Emphasis added).
In Common Cause, we recognized that the legislature did not define “public body” or “governmental body” in the open meeting statutes. Common Cause, 263 Mont. at 330, 868 P.2d at 608. Thus, we gave the words in these phrases their “plain, ordinary and usual meaning” and stated that “the common understanding of the phrase ‘public or governmental body’ would include a group of individuals organized for a governmental or public purpose.” Common Cause, 263 Mont. at 330, 868 P.2d at 608 (citations omitted). There can be no doubt, this Court is a group of individuals organized by and under the Montana Constitution for a governmental purpose — as is the COP, the appointed disciplinary arm of this Court. It follows, then, that this Court and its COP are both public or governmental bodies.
¶107 Similarly, in Great Falls Tribune Co., Inc. v. Day, 1998 MT 133, ¶ 16, 289 Mont. 155, ¶ 16, 959 P.2d 508, ¶ 16, this Court, in determining whether the Department of Corrections Committee for Private Prison Screening and Evaluation was a “public body,” looked to the Montana Procurement Act, which defines “governmental body” as:
*528 [A] department, commission, council, board, bureau, committee, institution, legislative body, agency, government corporation, or other entity, instrumentality, or official of the executive, legislative, or judicial branch of this state, including the board of regents and the Montana university system.
Section 18-4-123(11), MCA (emphasis added). We stated that, since the committee was a committee of the executive branch of government, and a “governmental body” for purposes of procurement, “it necessarily follows that it is an agency of state government to which Article II, Section 9, applies.” Great Falls Tribune, ¶ 17. This Court is clearly an “entity... of the ...judicial branch of this state,” and, therefore, a “governmental body.” Section 18-4-123( 11), MCA. Thus, it “necessarily follows” that this Court is a “public body” to which Article II, Section 9, applies. Great Falls Tribune, ¶ 17. It also “necessarily follows” that the COP, as the disciplinary arm of the judicial branch of government, is an agency of state government to which Article II, Section 9, applies. Great Falls Tribune, ¶ 17
¶108 The same conclusion can be drawn from our decision in Becky v. Butte-Silver Bow Sch. Dist. 1 (1995), 274 Mont. 131, 906 P.2d 193. In Becky, this Court, in determining whether the records of an organization were “documents of public bodies,” looked to § 2-6-101(2)(a), MCA, which states that “public writings” are:
[T]he written acts or records of the acts of the sovereign authority, of official bodies and tribunals, and of public officers, legislative, judicial, and executive, whether of this state, of the United States, of a sister state, or of a foreign country;
Becky, 274 Mont. at 137, 906 P.2d at 197 (quoting § 2-6-101(2)(a), MCA) (emphasis added). Section 2-6-101, MCA, also states that there are four classes of public writings and that “judicial records” are one of the classes. Section 2-6-101(3)(b), MCA. Finally, although we recognized that “documents of public bodies” is not defined in the Montana Constitution, we stated that “it must reasonably be held to mean documents generated or maintained by a public body which are somehow related to the function and duties of that body.” Becky, 274 Mont. at 138, 906 P.2d at 197.
¶109 Applying the definition of “public writings” found in § 2-6-101(2)(a), MCA, it is clear that most, if not all, of the documents which this Court generates and maintains are “public writings,” and, therefore, are “documents of a public body.” Thus, since the documents which this Court generates and maintains are “documents of a *529 public body,” it follows (perhaps backwardly) that this Court is a “public body” to which Article II, Section 9, applies. Similarly, documents filed with and generated by the COP as the disciplinary arm of this Court are likewise “documents of a public body.”
¶110 As these cases demonstrate, this Court has been particularly vigilant and uncompromising in protecting Montanans’ constitutional “right to know” and in rejecting other governmental bodies’ attempts to limit or subvert this right. In Great Falls Tribune, for example, the committee argued that the public’s right to observe its meetings with private companies which had submitted proposals to build a private correctional facility in Montana and to review the papers associated with the compames’ proposals was outweighed by the companies’ right to privacy in the information that they had submitted. Great Falls Tribune, ¶ 8. We held, however, that the Great Falls Tribune had a constitutional right under Article II, Section 9, to observe the committee’s deliberations and to examine the committee’s documents, including proposals that had been submitted to it. Great Falls Tribune, ¶ 33. We also stated that the only exception to the public’s right to observe the committee’s deliberations and documents concerned information to which the companies had a privacy interest. Great Falls Tribune, ¶ 33.
¶111 And, of course in the proceedings at bar, the only persons with privacy rights at issue — Goldstein and Albers-have waived their rights.
¶112 In sum, and based on the foregoing, if there exists some valid argument for exempting the filings (including pre-complaint filings), the deliberations and decision-making processes of the COP from the operation of Article II, Section 9, the rationale is neither apparent in the tenor of our prior jurisprudence nor, more importantly, in the plain language of the constitutional provision itself or in the history of its adoption.
f 113 Therefore, I would hold that Rule 13 is unconstitutional, not only because it fails to protect the due process rights of attorneys subject to discipline before the COP and this Court, but, and more fundamentally, because the Rule violates the right to know provisions of Montana’s Constitution, Article II, Section 9.

De Novo Review

¶114 Finally, I am compelled to address the lynchpin of the majority’s rationale, the conclusion which runs throughout its opinion — that, because this Court retains de novo review of the findings, *530 conclusions and recommendations of the COP, attorneys’ right to due process, to impartiality and to even greater protection than that enjoyed by other professionals in disciplinary proceedings is preserved. See ¶ 26.
¶115 True. This Court does retain de novo review, as the majority points out. The protections provided by this review are illusory, however, and exacerbate, rather than alleviate the prejudice inherent in Montana’s disciplinary system.
¶ 116 First, let us ignore the fact that, according to the unchallenged statement of Goldstein’s attorney, in the past 25 years there cannot be found one case in which this Court has rejected or substantially altered the findings of fact of the COP; that in only six cases over the past 25 years did this Court alter the recommendations of the COP; that in four of those cases we imposed a greater punishment than recommended; that in one case, we imposed less punishment than that recommended; and in only one case, Matter of McKeon (1982), 201 Mont. 515, 656 P.2d 179, did we actually reject the OOP’s recommendation and reinstate the attorney to the practice of law. While the COP contended at oral argument that this track record proved how well the present system worked, it is just as, if not more, likely that this simply proves that, not surprisingly, this Court relies almost exclusively on and accepts without question the findings, conclusions and recommendations of the “fact finder” COP, rather than on any de novo examination of the record which we undertake.
¶117 Second, let us assume for purposes of this opinion, that every member of this Court does, in fact, review every page of the record and transcript of every disciplinary proceeding[4] before voting on the COP’s findings, conclusions and recommendations. That still does not solve the problem that the members of this Court never actually see and judge the demeanor and credibility of the witnesses who testify at the COP hearings or of the respondent attorney subject to the disciplinary proceedings. And, this is no small deficiency.
¶118 In Bonamarte v. Bonamarte (1994), 263 Mont. 170, 866 P.2d 1132, grounding our decision in due process considerations, we re *531 versed the trial court, holding that it had abused its discretion in allowing a party/witness in a contested proceeding to testify by telephone over objection. Bonamarte, 263 Mont at 178, 866 P.2d at 1137. Among other things we stated that requiring a witness to testify in the presence of the fact finder “assists the trier of fact in evaluating the witness’ credibility by allowing his or her demeanor to be observed firsthand.” Bonamarte, 263 Mont. at 174, 866 P.2d at 1134. We then went on to state:
The integrity of the fact finding process at trial is undermined where the parties do not have the opportunity to confront each other or the witnesses, where the finder of fact does not have the opportunity to observe the parties and the witnesses and where the opposing party cannot effectively cross-examine the other party or the witnesses.
Here, it was impossible for the court to make a determination as to the relative credibility of the party-witnesses because it did not have an opportunity to observe the testimony of both Mark and Judith. ... [I]t is the court’s role to determine who is the more credible witness. This can be accomplished most effectively by observing each party’s demeanor during testimony.
Bonamarte, 263 Mont. at 175-76, 866 P.2d at 1135 (emphasis added). We concluded by noting that: “The opportunity to observe a witness is so critical to judicial control and effective cross-examination that its denial is manifestly prejudicial.” Bonamarte, 263 Mont. at 178, 866 P.2d at 1137 (quoting State ex rel. Juv. Dept. v. Gates (Or. 1987), 740 P.2d 217, 218) (emphasis added).
¶119 We have subsequently reaffirmed our commitment to the Bonamarte rule in other proceedings. See Taylor v. Taylor (1995), 272 Mont. 30, 34-35, 899 P.2d 523, 525-26 (contested administrative child support proceeding); Matter of B.C. (1997), 283 Mont. 423, 427-28, 942 P.2d 106, 109 (judicial termination of parental rights); Bean v. Montana Board of Labor Appeals, 1998 MT 222, ¶ 33, 290 Mont. 496, ¶ 33, 965 P.2d 256, ¶ 33 (contested administrative unemployment compensation proceeding).
¶120 Given our application of the Bonamarte rule in both court cases and in administrative proceedings and given our unequivocal determination of the importance to the “integrity of the fact finding process” that the trier of fact actually be able to see and to judge the credibility of witnesses and parties, I am at a loss to understand how *532 this Court can conduct any sort of a meaningful de novo review of COP proceedings from a cold review of the record having never actually seen witness or party one.
¶121 Keep in mind that, as the majority goes to great lengths to repeatedly point out, the saving grace for all the infirmities of the present attorney disciplinary scheme is that this Court has “taken upon itself the sole responsibility to adjudicate lawyer ethical violations,” ¶ 26, and that “this Court exercises de novo review over the findings of the [COP],” ¶ 30, which “makes only recommendations for discipline,” ¶ 26. Taking that at face value, one is left to ponder how — in the face of Bonamarte and its progeny — this Court can truly exercise its awesome responsibility of de novo review of proceedings where members of a profession can, literally, lose their livelihoods, their reputations, the benefit and expense of years of training and education, and their entire careers without our ever even seeing face-to-face the attorney being disciplined and his or her accusers and without being able to judge their credibility.
¶ 122 I can only conclude that, like our refusal to abide by Article II, Section 9, as to our deliberations, this is just another example of our telling the courts, administrative agencies, litigants and the citizens of Montana, “Do as we say, not as we do.”

Conclusion

¶ 123 I do not agree with any part of our decision. I would hold Rules 9 and 13 unconstitutional for the reasons set forth in this dissent. I would order immediately the sorts of reforms discussed herein as to Rule 9. I would allow attorney access to all documents and papers filed with the COP. I would order the OOP’s deliberations opened. And I would order Goldstein’s and Albers’ cases be reheard under these reformed procedures.
¶124 I dissent from our refusal to do so.

. See In the Matter of Scott A. Albers, No. 98-011, Order Denying Motion to Dismiss, June 12, 1998, (Nelson, J. dissenting).

. The 1965 disciplinary scheme did, arguably, have some due process “walls of division” that are lacking in the current rules. For example, the rules provided for a district judge to appoint three to five attorneys in each judicial district to be the local grievance committee to investigate complaints referred to the committee by the COP or a judge. The committee could recommend no charges be filed and the COP, if it concurred, would dismiss the complaint. If the grievance committee recommended the filing of charges and if the COP concurred, the COP would prepare and file the charges and the complaint would be signed by an interested person. A hearing examiner or hearing committee then heard the charges which the COP had drafted and a report was made to the COP, which could accept or reject the findings and recommendations. See Rules IV, VT and VIII of the 1965 Rules, adopted by this Court, Order No.10910, January 5,1965.

. This same rationale was set out inmy dissent to our August 3,1999 Order,In Re the Selection of a Fifth Member to the Montana Districting and Apportionment Commission. Since the majority cites to that order at ¶ 48 as authority for its decision on the Rule 13 issue and since our order was, technically, not published as an opinion, I will restate my rationale here.

. Of course no one except the individual members of this Court will ever know how these cases are actually reviewed, given the majority’s decision that Article II, Section 9, does not apply to our deliberations. See our August 3,1999 Order In Re the Selection of a Fifth Member to the Montana Districting and Apportionment Commission, cited at ¶ 48 of the majority opinion.